The FLYING TIGER LINE, a Delaware Corporation, Tiger International, Inc., a Delaware Corporation, Warren Transport, Inc., an Iowa Corporation, Plaintiffs & Counterdefendants,

v.

TEAMSTERS PENSION TRUST FUND OF PHILADELPHIA and vicinity, a/k/a Teamsters Pension Plan of Philadelphia and Vicinity, and Charles J. Schaffer, Jr., Counterplaintiffs,

v.

CENTRAL STATES, SOUTHWEST AND SOUTHEAST AREAS PENSION FUND, a multiemployer pension plan, Teamsters Pension Trust Fund of Philadelphia and Vicinity, a multiemployer pension plan, Western Pennsylvania Teamsters and Employers Pension Fund, a multiemployer pension plan, Teamsters Local 641 Pension Fund, a multiemployer pension plan, and Central Pennsylvania Teamsters Pension Fund, a multiemployer pension plan, each sued individually and as a member of a class of similarly situated multiemployer pension plans who assert withdrawal liability, against Hall's Motor Transit Company, under the Multiemployer Pension Plan Amendments Act of 1980.

Appeal of The FLYING TIGER LINE, INC., Tiger International Inc. and Warren Transport, Inc., Appellants.

Nos. 86–5817, 86–5931, 87–3063.

United States Court of Appeals, Third Circuit.

Argued July 13, 1987.

Decided Sept. 30, 1987.

Douglas D. Broadwater (argued), Cravath, Swaine & Moore, New York City, R. Franklin Balotti, Jesse A. Finkelstein, William W. Bowser, Richards, Layton & Finger, Wilmington, Del., for appellants.

Irving Morris, Carolyn D. Macks, Morris & Rosenthal, P.A., Wilmington, Del., Michael Evan Jaffe (argued), Rodney F. Page, James J. Armbruster, Arent, Fox, Kintner, Plotkin, Kahn, Washington, D.C., for appel-

lee Central States, Southwest and Southeast Areas Pension Fund.

Sidney Reitman, Bennet D. Zurofsky, Newark, N.J., for appellee Trucking Employees of North Jersey Welfare Fund, Inc.

D. Gayle Loftis, Chasan, Lerner, Tarrant & D'Italia, Jersey City, N.J., for appellee Teamsters Local 641 Pension Fund.

Thomas W. Jennings, Kent Cprek, Sagot & Jennings, Philadelphia, Pa., for appellee Teamsters Pension Trust Fund of Philadelphia and Vicinity.

Vincent P. Szeligo, Wick, Rich, Fluke & Streiff, Pittsburgh, Pa., for appellee Western Pennsylvania Teamsters and Employers Pension Fund.

Joel A. Smith, H. Victoria Hedian, Abato, Rubenstein and Abato, P.A., Lutherville, Md., for appellee Freight Drivers and Helpers Local Union No. 557 Pension Fund.

Peter H. Gould, Asst. Gen. Counsel, Stuart E. Bernsen (argued), Pension Ben. Guar. Corp., Washington, D.C., for amicus curiae Pension Ben. Guar. Corp.

Before HIGGINBOTHAM, BECKER and HUNTER, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

These appeals require us to determine whether a federal district court or an arbitrator should resolve the question whether a corporate entity is an employer subject to the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA" or "the Act"), 29 U.S.C. §§ 1381–1461 (1982 & Supp. I 1983 & Supp. II 1984 & Supp. III 1985). This employer status question arises in the context of a dispute concerning MPPAA section 1392(c), the so-called "evade or avoid" provision. The district court concluded that, pursuant to 29 U.S.C. § 1401 (1982), this question initially must be decided by an arbitrator. Appellants argue that their legal status—whether they are a MPPAA "employer"—is a predicate issue that must be resolved by a federal district court before an arbitrator can assert jurisdiction under MPPAA. Because we conclude that these appeals involve provisions of the Act that prescribe arbitration as the appropriate method of dispute resolution, we will affirm the district court's order staying its proceedings pending arbitration.

## I. OVERVIEW OF MPPAA

Under the Employee Retirement Income Security Act of 1974, Pub.L. No. 93–406, 88 Stat. 1020 ("ERISA"), as amended by MPPAA, employers may make contributions to one or more pension plans on behalf of all their employees who belong to a participating union. Congress enacted MPPAA in particular because it found that existing legislation "did not adequately protect plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans." [1] *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722, 104 S.Ct. 2709, 2714, 81 L.Ed.2d 601 (1984) ("*R.A. Gray*"); accord *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir.1986) ("The MPPAA was designed '(1) to protect the interests of participants and beneficiaries in financially distressed multiemployer plans, and (2) ... to ensure benefit security to plan participants.'") (original ellipses) (quoting H.R. Rep. No. 869, 96th Cong., 2d Sess. 71 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 2939) ("*Barker & Williamson*"). The Act addressed this problem by assessing such employers with

---

1. Congress crafted [MPPAA's] intricate scheme in response to evidence that the preexisting pension plan termination insurance program, enacted as title IV of [ERISA], perversely operated to provide employers with an incentive to withdraw from financially weak plans. The tendency of employers to abandon financially fragile plans posed a threat, in turn, to the solvency of the Pension Benefit Guaranty Corporation, the ERISA–created entity charged with administering the program and insuring payment of vested benefits when a plan terminates with insufficient assets.... The MPPAA was designed to shore up on these weak points.
*I.A.M. Nat'l Pension Fund, Plan A, A Benefits v. Clinton Engines Corp.,* 825 F.2d 415, 416 (D.C. Cir.1987).

withdrawal liability, defined in the statute as the employer's adjusted "allocable amount of unfunded vested benefits." 29 U.S.C. § 1381(b)(1) (1982).

We will briefly outline the MPPAA provisions that are relevant to this case. The Act requires that "all ... trades or businesses (whether or not incorporated) [that] are under common control", as defined in regulations issued by amicus curiae the Pension Benefit Guaranty Corporation ("PBGC"), "shall be treated ... as a single employer."[2] 29 U.S.C. § 1301(b)(1) (1982). Since a controlled group is to be treated as a single employer, each member of such a group is liable for the withdrawal of any other member of the group. *See Barker & Williamson*, 788 F.2d at 127–28. In determining whether a withdrawal has occurred, MPPAA explicitly provides that any transaction designed to "evade or avoid" withdrawal liability should be ignored: "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." 29 U.S.C. 1392(c) (1982).

Provisions for the quick and informal resolution of withdrawal liability disputes are an integral part of MPPAA's statutory scheme. The Act requires a plan's trustees to determine initially whether a withdrawal has occurred. 29 U.S.C. §§ 1382(1), 1399(b)(1)(A)(i) (1982). When the trustees conclude that a withdrawal has taken place, they must then notify the employer of the amount of liability and demand payment in accordance with an amortization schedule. 29 U.S.C. §§ 1382(2), 1382(3), 1399(b)(1)(B) (1982). Thereafter, the employer may within 90 days ask the trustees to conduct a reasonable "review" of the computed liability. 29 U.S.C. § 1399(b)(2)(A)(i) (1982). If a dispute remains, either party may initiate arbitration proceedings. MPPAA provides that

[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under

sections 1381 through 1399 of ... title [29] shall be resolved through arbitration. Either party may initiate the arbitration proceeding within [specified time periods].

29 U.S.C. § 1401(a)(1) (1982). Finally, "[u]pon completion of the arbitration proceedings in favor of one of the parties," MPPAA permits "any party thereto" to bring an action "to enforce, vacate or modify the arbitrator's award" in the appropriate federal district court. 29 U.S.C. § 1401(b)(2) (1982). Regardless of whether the employer requests review by a plan's trustees or initiates arbitration, however, the employer must begin making interim payments of the withdrawal liability in accordance with the plan's schedule within 60 days of notice of liability. *See* 29 U.S.C. §§ 1399(c)(2), 1401(d) (1982); *see also Banner Indus., Inc. v. Central States, Southeast & Southwest Areas Pension Fund*, 663 F.Supp. 1292, 1297–98 (N.D.Ill.1987) ("Congress has clearly established the balance it deems appropriate with respect to which party should have use of the money during the pendency of a dispute over withdrawal liability."); *Robbins v. Pepsi–Cola Metro. Bottling Co.*, 636 F.Supp. 641, 677 (N.D.Ill.) ("The MPPAA contemplates a 'pay now, dispute later' procedure."), *petition for supersedeas bond or entry of stay pending appeal denied*, 800 F.2d 641 (7th Cir.1986).

## II. BACKGROUND OF THIS DISPUTE

Appellant Tiger International, Inc. ("Tiger"), is a holding company engaged through its subsidiaries—which include appellants The Flying Tiger Line, Inc. and Warren Transport, Inc.—in the air cargo, transportation, and trucking businesses. On January 2, 1980, Tiger acquired 100% of the stock of Hall's Motor Transit Co. ("Hall's"), a large interstate trucking company. Pursuant to collective bargaining agreements, Hall's had contributed for many years until early 1986 to a number of multiemployer pension plans on behalf of

**2.** In *Barker & Williamson,* a MPPAA withdrawal liability dispute, we explained in detail how MPPAA incorporates the "controlled group of

corporations" definition of the Internal Revenue Code. *See* 788 F.2d at 123 (referring to 26 U.S.C. § 1563(a)(1) (1982)).

most of its approximately 3,500 employees. A number of factors, including deregulation of the trucking industry, caused Hall's to incur operating losses each year from 1981 through 1984. These losses occurred notwithstanding the extensive financial support Hall's received from Tiger during that time period.[3]

In January 1985, Tiger sold 75% of its Hall's stock to Hall's Acquisition Corporation ("HAC"), a corporation wholly owned by Alvin Bodford, Hall's Chief Financial Officer. In consideration for the stock it received in this deal, HAC gave Tiger a $10.5 million promissory note that memorialized Hall's preexisting indebtedness to Tiger. To secure this note, Tiger received a blanket subordinated security interest in certain real and personal property of Hall's.

When HAC thus became the principal owner of Hall's, HAC agreed to honor Hall's obligations to contribute to various multiemployer pension plans. In addition, as part of its sale agreement with Tiger, HAC explicitly assumed full legal responsibility for any withdrawal liability that Hall's and/or Tiger might incur in the future.[4] In late 1985, with Hall's again in need of capital, Tiger agreed to transfer its remaining 25% interest in Hall's to HAC for no consideration. Tiger also agreed to restructure the $10.5 million promissory note and to release its lien on Hall's assets

in an effort to help Hall's obtain additional financing. When its requests for such financing were subsequently denied, Hall's filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101–1174, on March 10, 1986.

Upon filing its bankruptcy petition, Hall's severely cut back its operations and stopped making its contributions to the multiemployer pension plans. In Hall's bankruptcy proceeding, twelve of these plans asserted MPPAA withdrawal liability claims aggregating in excess of $36 million. At approximately the same point in time, Tiger's management was informed that several of Hall's multiemployer pension plans intended to assert that Tiger was jointly and severally liable for Hall's withdrawal liability.

On July 2, 1986, pursuant to MPPAA section 1399(b)(2)(A),[5] Tiger submitted a request to appellee Central States, Southwest and Southeast Areas Pension Fund ("Central States"), one of Hall's multiemployer pension funds, to review the question of Tiger's liability for Hall's withdrawal. Central States eventually responded with a Board of Trustees' finding that, based upon available information,[6]

> a principal purpose of the Hall's divesture by the Tiger International Control Group was to avoid or evade withdrawal liability. Accordingly, the Board of Trustees ... determined, pursuant to

---

3. The record indicates that during 1984, for example, Tiger supported Hall's with a $2.5 million intercompany loan.

4. Paragraph 39 of Tiger's complaint alleges that, [p]ursuant to the terms of the January 7, 1985 sale, Hall's had an ongoing obligation to make payments to the various multiemployer pension plans to which Hall's contributed at substantially the same levels as in the past. HAC agreed to indemnify and to cause Hall's to indemnify Tiger from and against any and all MPPAA liability arising as a result of any action or failure to act by either HAC or Hall's from and after January 7, 1985.
Joint Appendix ("J.A.") at 128–29.

5. Section 1399(b)(2)(A) states that, [n]o later than 90 days after the employer receives the notice [of the amount of the liability and the schedule for liability payments], the employer—

> (i) may ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments,
> (ii) may identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer, and
> (iii) may furnish any additional relevant information to the plan sponsor.
29 U.S.C. § 1399(b)(2)(A) (1982).

6. Central States asked Tiger in writing to provide information to support its claim that, as a result of the January 1985 sale to HAC, it was not responsible for Hall's withdrawal liability. Tiger never responded to this request pursuant to MPPAA section 1399(a), which states that "an employer shall, within 30 days after a written request from the plan sponsor, furnish such information as the plan sponsor reasonably determines to be necessary to enable the plan sponsor to comply with the requirements of this part." 29 U.S.C. § 1399(a) (1982).

ERISA Section 4212(c) [29 U.S.C. § 1392(c) (1982)], that it must disregard that transaction and that the Tiger International Controlled Group (including Hall's) is the employer responsible for Hall's withdrawal liability.

J.A. at 798.

Tiger did not, however, wait for this response from Central States. Rather, on July 3, 1986, Tiger and its subsidiaries filed a federal class action complaint seeking declaratory and injunctive relief against Central States and the other plans that had asserted or had threatened to assert claims for withdrawal liability against Hall's. In Count I of its complaint, Tiger sought a declaration that it was not liable for any withdrawal liability that might be owed to the plans by Hall's and an order enjoining the plans from asserting claims for such liability against Tiger. In support of this count, Tiger claimed that, as a result of its sale to HAC in January 1985 of 75% of Hall's stock, Hall's was no longer part of the Tiger-controlled group when the withdrawal occurred in March 1986.[7] In addition, Tiger argued that MPPAA section 1401 specifically refers to disputes between "employers" and plans,[8] and that Tiger's status as an employer therefore should be judicially determined before it is compelled to enter arbitration.

The plans moved to dismiss Tiger's complaint for lack of subject matter jurisdiction, principally on the ground that all disputes concerning MPPAA withdrawal liability must be resolved by plan trustee determinations, trustee review, and MPPAA arbitration before appeal to a federal district court. On September 12, 1986, the district court denied these motions to dismiss and ruled that "the Court ... will decide the question of Tiger's status under MPPAA in relation to Hall's alleged withdrawal liability." *The Flying Tiger Line, Inc. v. Central States, Southwest & Southeast Areas Pension Fund*, No. 86–304, mem. op. at 12–13 (D.Del. Sept. 12, 1986). The district court based its decision to resolve Tiger's employer status on a determination that Tiger had demonstrated a likelihood of irreparable injury sufficient to exempt Tiger from the requirements of the exhaustion doctrine. The court held that Tiger would suffer irreparable harm because it would be required by MPPAA section 1401(d)[9] to make interim payments of the assessed withdrawal liability during arbitration. *Id.* at 14–15.

The multiemployer pension plans thereafter moved for reconsideration. On October 17, 1986, the district court vacated its September 12th order, holding that "any further consideration of Count I is stayed pending arbitration." *The Flying Tiger Line, Inc. v. Central States, Southwest & Southeast Areas Pension Fund*, 659 F.Supp. 13, 15 (D.Del.1986). The court concluded that, while Tiger faced serious fi-

7. Tiger's complaint also alleged that provisions of MPPAA are unconstitutional·on their face and as applied. These issues were stayed by the district court and are not part of this appeal.

8. Section 1401 governs
   [r]esolution of disputes[.]
   (a) Arbitration proceedings; matters subject to arbitration, procedures applicable, etc.
   (1) Any dispute between *an employer* and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration. Either party may initiate the arbitration proceeding within a 60–day period after the earlier of—
      (A) the date of notification to *the employer* under section 1399(b)(2)(B) of this title, or
      (B) 120 days after the date of *the employer's* request under section 1399(b)(2)(A) of this title.
   29 U.S.C. § 1401 (1982) (emphases added).

9. Section 1401 provides for
   **(d) [p]ayments by employer prior and subsequent to determination by arbitrator; adjustments; failure of employer to make payments[.]**
   Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination. If the employer fails to make timely payment in accordance with such final decision, the employer shall be treated as being delinquent in the making of a contribution required under the plan (within the meaning of section 1145 of this title).
   29 U.S.C. § 1401 (1982).

nancial hardship, there was no reason to "believe that Tiger w[ould] be harmed more if forced to go to arbitration than if Tiger goes to court." *Id.* The court noted that the pension plans would have to petition the court to enforce the interim payments requirement of MPPAA section 1401(d) and that the possible harm that would result from the threat of withdrawal liability would be the same regardless of the forum in which this dispute was adjudicated. *Id.* at 15.

The district court also addressed Tiger's claim that arbitration may be bypassed because this case involves a question of pure statutory interpretation. The court found that Tiger's status as an employer can be decided only by addressing the question whether Tiger's January 1985 sale of Hall's to HAC was designed to evade or avoid withdrawal liability as defined in MPPAA section 1392(c).[10] The district court identified a need for factual determinations to resolve the legal questions raised by Count I of the complaint, and held that those findings should be made by an arbitrator in the first instance.[11]

## III. APPLYING MPPAA TO THIS DISPUTE

The district court certified the following question for appeal:

> May a corporation that legitimately believes its status as a MPPAA "employer" is doubtful have that issue resolved by a federal court in a timely declaratory action, wherein the federal district court will determine the legal and factual issues necessary for a determination that the corporation is subject to MPPAA liability and procedures, or must the issue of MPPAA applicability and liability instead be determined by a MPPAA arbitrator?

*The Flying Tiger Line, Inc. v. Central States, Southwest & Southeast Areas Pension Fund,* No. 86–304, mem. order ¶ 1 (D.Del. Dec. 4, 1986) [Available on WEST-LAW, DCT database]. We conclude that where the party against which withdrawal liability is being asserted was certainly part of the controlled group of an employer subject to MPPAA at some point in time, and where the issues in dispute fall within the purview of MPPAA provisions that are explicitly designated for arbitration, the Act's dispute resolution procedures must be followed.

Tiger contends that because MPPAA section 1401 specifies that "employers" are required to arbitrate disputes, entities that legitimately question their status as employers are entitled to judicial resolution of this issue before being compelled to arbitrate under MPPAA. Admittedly, section 1401 refers to "employers"; the more fundamental question, however, concerns what needs to be decided to dispose of Count I of Tiger's complaint. Tiger claims that the issue is whether it was an "employer" at the time Hall's withdrew from the plans. The multiemployer pension funds argue, and the district court ultimately determined, that Tiger's status can only be defined by deciding whether the January 1985 sale was a sham transaction designed to relieve Tiger of Hall's withdrawal liability. Because we agree that the central dispute between Tiger and the funds concerns whether the sale must be ignored under MPPAA's "evade or avoid" provision, we are guided by the Act's language that clearly states that "[a] dispute between an employer and the plan sponsor of

---

10. Section 1392(c) governs

   [t]ransactions to evade or avoid liability[.]
   If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction.

   29 U.S.C. § 1392(c) (1982). In a recent MPPAA decision, we described section 1392(c) as a "good faith requirement." *Dorn's Transp., Inc. v. Teamsters Pension Trust Fund of Philadelphia & Vicinity,* 787 F.2d 897, 902 (3d Cir.1986).

11. The district court's decision is an appealable final order under 28 U.S.C. § 1291 (1982). *See Barker & Williamson,* 788 F.2d at 122 ("Because the district court compelled arbitration, its order is reviewable as a final judgment under 28 U.S.C. § 1291 [ (1982) ]."). In addition, on January 9, 1987, we granted Tiger's motion to appeal pursuant to 28 U.S.C. § 1292(b) (1982). *See* J.A. at 39.

a multiemployer plan *concerning a determination made under sections 1381 through 1399 of this title* shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1) (1982) (emphasis added). We agree with the district court that "characterizing the issue to be decided as whether or not Tiger was an 'employer' is a broad brush description of a specific issue. The case really turns on the determination of the 'evade or avoid' question, a question properly before the arbitrator." *The Flying Tiger Line v. Central States*, at 17.

### A. *Relevant Legislative History*

■ The legislative history of MPPAA indicates that Congress specifically contemplated that disputes concerning "evade or avoid" transactions such as Tiger's 1985 sale would be resolved through arbitration. Representative Frank Thompson, Jr., Democrat of New Jersey, the principal House sponsor of the bill, stated that

> transactions undertaken to evade or avoid withdrawal liability may not be used as a method of escaping withdrawal liability that would otherwise be imposed. It is intended that the plan sponsor, *the arbitrator*, and the courts follow the substance rather than the form of such

transactions in determining, assessing, and collecting withdrawal liability.

126 Cong.Rec. H23038 (daily ed. Aug. 25, 1980) (emphasis added). This explicit reference to "the plan sponsor, the arbitrator, and the courts" demonstrates that Congress intended "evade or avoid" disputes to be resolved through the MPPAA sequence of procedures, which places arbitration prior to court action.[12]

### B. *The Role of Arbitration Under MPPAA*

The arbitration requirement is an important component of MPPAA's scheme to secure the financial health of multiemployer pension plans. Arbitration of withdrawal liability disputes substantially reduces the expenses incurred by multiemployer plans while it bears a burden that would otherwise fall on the federal courts. "[A]rbitration promotes judicial economy and judicial restraint, both because the arbitrator's decision may dispose of the suit, and even if one party appeals the arbitrator's decision, the court will have the benefit of the arbitrator's analysis." *Robbins v. Chipman Trucking, Inc.*, 8 Employee Benefits Cas. (BNA) 1251, 1258 (N.D.Ill.1986) (*"Chipman Trucking"*) [Available on WESTLAW, DCT database].[13] Congress clearly de-

---

**12.** The PBGC, which administers MPPAA, has also concluded that disputes over determinations under 29 U.S.C. § 1392(c) must be resolved through the MPPAA statutory framework. In an opinion letter, the PBGC has stated that

> [i]t is the plan sponsor's responsibility in the first instance to determine whether a withdrawal has occurred and *the identity of the liable employer.* Disputes arising over such withdrawal liability determinations must be resolved under the dispute resolution procedures of [29 U.S.C. §§ 1399 and 1401 (1982)].

PBGC Op. 85–5 (Jan. 30, 1985) (emphasis added). MPPAA grew out of policy recommendations made by the PBGC in a study ordered by Congress, *see R.A. Gray*, 467 U.S. at 721–23, 104 S.Ct. at 2713–15, and PBGC's interpretations of the Act's provisions deserve serious consideration. *See Vornado, Inc. v. Trustees of the Retail Store Employees' Union Local 1262*, 829 F.2d 416, 421 (3d Cir.1987) ("We have reached our conclusion ... on the basis of our independent judgment, exercising a plenary review of the purely legal questions presented. The [PBGC's] views have been helpful and informative, but we do not 'defer' to its opinion in the sense that the result we reach is anything other than our

own view of the proper interpretation of the statute."); *cf. Barker & Williamson*, 788 F.2d at 127 ("We recognize that because [a] statement by the PBGC was not promulgated as part of a regulation, and is merely a general statement of policy, it is therefore due little deference.... Nonetheless, we find its reasoning persuasive.") (citation omitted); *see generally Robbins v. McNicholas Transp. Co.*, 819 F.2d 682, 686 (7th Cir.1987) ("The views of the Corporation are entitled to deference because of its responsibility for the enforcement of Title IV of ERISA."); *Connolly v. Pension Benefit Guar. Corp.*, 581 F.2d 729, 730 (9th Cir.) ("the determination of the PBGC is entitled to great deference in the construction and application of ERISA"), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979).

**13.** Additionally, under section 1401(c), a reviewing court must presume that an arbitrator's findings of fact are correct unless rebutted by "a clear preponderance of the evidence." 29 U.S.C. § 1401(c) (1982). *See United Retail & Wholesale Emp. Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128, 135 n. 9 (3d Cir.1986), *aff'd per curiam by an equally divided Court sub nom. Pension Bene-*

signed MPPAA so that court will be the final forum for dispute resolution, and MPPAA's purposes would be undermined by the expense and delay that would be involved if litigation occurred prior to the Act's dispute resolution procedures. Accordingly, we again emphasize the importance of "the legislature's decision that arbitration, and not the courts, is the proper forum for the initial resolution of disputes [under MPPAA]." *Republic Indus., Inc. v. Central Pa. Teamsters Pension Fund*, 693 F.2d 290, 295 (3d Cir.1982) (*"Republic Industries"*); accord *Central States, Southeast & Southwest Areas Pension Fund v. MGS Transp., Inc.*, 661 F.Supp. 54, 56 (N.D.Ill.1987) ("This congressional preference for arbitration should be respected."); *Terson Co., Inc. v. Pension Benefit Guar. Corp.*, 565 F.Supp. 203, 208 (N.D.Ill.1982) ("[T]he court must consider the fact that Congress, when it created the statutory scheme encompassing ERISA and the MPPAA, deemed arbitration as the proper forum for the adjudication of claims arising out of this scheme. We cannot blithely ignore the express intent of Congress."); cf. *Refined Sugars, Inc. v. Local 807 Labor–Management Pension Fund*, 580 F.Supp. 1457, 1461 (S.D.N.Y.1984) (MPPAA "sections 1381 through 1399 cover the determinations for which Congress has provided an arbitral resolution").

We also note that two other circuits have recently emphasized the clarity of MPPAA's arbitration requirement. The D.C. Circuit has held that

> initial recourse to arbitration is *a statutory direction,* one generally to be followed unless neither party timely presses the plea in abatement[ ] *and* the court finds that deferring a court contest while the parties repair to arbitration "will neither lead to the application of superior expertise nor promote judicial economy."

*Grand Union Co. v. Food Employers Labor Relations Ass'n*, 808 F.2d 66, 70 (D.C. Cir.1987) (initial emphasis added) (quoting *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.*, 727 F.2d 1204, 1210 (D.C.Cir.1984)) (*"Grand Union"*). In

*Marvin Hayes Lines, Inc. v. Central States, Southeast & Southwest Areas Pension Fund*, 814 F.2d 297 (6th Cir.1987), the Sixth Circuit concluded that, "[u]nless an employer is mounting a facial constitutional attack or making a verifiable claim of irreparable injury, the courts have *no jurisdiction* to entertain the merits of the dispute prior to arbitration." *Id.* at 300 (emphasis added).

### C. *Relevant Decisional Law*

■ Tiger relies primarily on this Court's decision in *Barker & Williamson* for the proposition that an alleged employer may bring a declaratory judgment action to have its status determined before such a corporate entity must engage in arbitration. We there suggested that, in addition to (1) trustee review and arbitration, or (2) complete inaction,

> a third course ... available ... [to a] corporation [that] legitimately believes its status as a controlled group member is doubtful[ is to] bring a declaratory judgment action to have that question resolved by a federal court. In such a proceeding, the corporation could request that the court enjoin the running of the statutory period for seeking review and arbitration.... [T]he corporation [could also] ... request[ ] review by the fund and arbitration and mak[e] the interim payments to the fund contingent upon the outcome of the declaratory judgment action.

788 F.2d at 129.

The language of *Barker & Williamson* cannot be read so broadly as to change the clear meaning of MPPAA section 1401. In *Barker & Williamson*, this Court was required to interpret MPPAA section 1301 to determine whether Sentinel Electronics, Inc. ("Sentinel"), the putative controlled group member, had *become* such an employer "at the time" Barker & Williamson, Inc. ("B & W"), the contributing employer, completely withdrew from its multiemployer pension plan. 788 F.2d at 123. The central legal question in *Barker & Williamson* asked whether Sentinel's interest

in certain B & W stock constituted an option that gave Sentinel constructive ownership over B & W "as of that date." *Id.* When B & W defaulted on its payments, the fund's trustees alleged that Sentinel was a member of B & W's controlled group, that Sentinel and B & W were a single employer under MPPAA section 1301(b), and, therefore, that Sentinel was liable for the full amount of B & W's withdrawal liability. Sentinel did not challenge the trustees' assessment of withdrawal liability in any fashion; it simply "d[id] nothing[,] ... gambl[ing] that it w[ould] not later be found to be a member of a controlled group with the withdrawn employer." *Id.* at 129. We affirmed the district court's legal determination that Sentinel was the constructive owner of B & W's stock on the date in question, *id.* at 122–26, and, accordingly, we held Sentinel liable for the full amount of B & W's withdrawal liability. *Id.* at 129–30. By "do[ing] nothing," Sentinel "los[t] the possibility of review and arbitration" under MPPAA. *Id.* at 129.

The factual context of *Barker & Williamson* defines one relatively clear limit on the declaratory judgment course of action. Our reference there to this "third course" of action referred to disputes, such as Sentinel's unsuccessful stock option/controlled group argument, that arise under MPPAA provisions that fall outside of the section 1381 through 1399 range. The reference does not undermine section 1401's clear mandate that disputes within that range of sections be arbitrated.

We emphasize the legal dissimilarity of the two disputes. In *Barker & Williamson*, the issue was whether Sentinel had become a MPPAA employer in time to incur liability for B & W's withdrawal. Here, the issue is whether Tiger ceased to be a MPPAA employer in time to avoid liability for Hall's withdrawal. The latter unavoidably raises an "evade or avoid" issue under section 1392(c) that cannot be a part of the former. This dispute centers, in other words, upon the trustees' determination under section 1392(c) that a principal purpose of Tiger's sale of Hall's stock was to evade or avoid withdrawal liability; it is not simply a matter of whether Tiger was an "employer" as defined by the statute at the time of Hall's withdrawal.[14]

While no provision of MPPAA specifically addresses who should resolve questions concerning the status of a one-time employer, the statutory scheme specifically provides that once an entity is an employer, it will be deemed to have withdrawn when it "permanently ceases to have an obligation to contribute under the plan." 29 U.S.C. § 1383(a) (1982). Any such employer will, under MPPAA section 1381, be assessed withdrawal liability unless that employer satisfies a statutory provision relieving it of liability. A district court in *Banner Indus., Inc. v. Central States, Southeast & Southwest Areas Pension Fund*, 657 F.Supp. 875, *issues certified for appeal*, 663 F.Supp. 1290, *subsequent opinion*, 663 F.Supp. 1292 (N.D.Ill.1987), recently concluded that

[w]hether the requirements of [a statutory] safe-haven have been satisfied necessarily turns on the facts of each case.... [T]he issue of whether one remains an employer on the date of withdrawal is not the same issue as whether one ever became an "employer" for the purposes of ERISA generally and MPPAA in particular. The latter is an issue for the court since its resolution determines the arbitrator's authority over the dispute. The former is an issue for the arbitrator since its resolution turns on the applicability of MPPAA provisions relating to employer withdrawals—provisions Congress specifically placed within the purview of the arbitrator.

---

14. *Cf. Banner Indus., Inc. v. Central States, Southeast & Southwest Areas Pension Fund*, 657 F.Supp. 875, 881–82 (N.D.Ill.1987) ("The issue presented by Banner ... is not whether Banner is an 'employer' as defined by the statute, but rather whether Banner at some point *ceased* to be an employer by ceasing to possess those characteristics [that] caused it to be deemed an employer—in this case, by divesting itself of a majority of its ownership interest in Commercial in March 1983.") (original emphasis).

657 F.Supp. at 882 (footnote omitted); *accord id.* at 883 ("[W]e disagree with Banner that the factual disputes in this case bear on Banner's 'employer' status. Rather, they bear on Banner's *continued* employer status, an inherently different question.") (original emphasis); *cf. Tri–State Rubber & Equip., Inc. v. Central States Southeast & Southwest Areas Pension Fund,* 661 F.Supp. 46, 47 (E.D.Mich.1987) ("No court has required interim payments from a company that claims it was *never* 'an employer.'") (emphasis added). We find this distinction to be persuasive.

Courts that have resolved employer status questions prior to arbitration have been concerned with entities that *never* have been employers subject to MPPAA and that, therefore, legitimately question application of MPPAA's dispute resolution procedures to them. For example, in *Central Transp., Inc. v. Central States, Southeast & Southwest Areas Pension Fund,* 639 F.Supp. 788 (E.D.Tenn.1986), *aff'd per curiam in an unpublished opinion,* 816 F.2d 678 (6th Cir.) (table) [Available on WESTLAW, CTA6 database] (opinion available on LEXIS, Genfed library, USApp file), petition for cert. filed, 56 U.S.L.W. 3185 (U.S. Sept. 22, 1987), a corporation, Central Transport, entered into an agreement to purchase Mason & Dixon Lines, Inc., the parent of a subsidiary corporation called Tank Lines. This purchase agreement, however, was contingent upon Interstate Commerce Commission ("ICC") approval. Before such approval was received, Tank Lines ceased contributing to its multiemployer pension plans. While the ICC subsequently did approve Central Transport's purchase agreement, the court held Central Transport was not liable for Tank Line's withdrawal because Central Transport had not exercised control over Tank Lines at the time the withdrawal occurred. The court held as a matter of law that, as of the withdrawal date, Central Transport had *never* been an employer. *See* 639 F.Supp. at 791; *cf. United Paperworkers Int'l Union, Local No. 35 Pension Plan v. Arlington Sample Book Co.,* 5 Employee Benefits Cas. (BNA) 1948 (E.D.Pa.1984) (issue whether president and sole shareholder of a MPPAA corporate employer was himself an "employer" under MPPAA sections 1002(5) and 1102(9)); *Refined Sugars, Inc.,* 580 F.Supp. 1457 (issue whether corporation was an "employer"); *Baldwin v. Shopmen's Ironworkers Pension Trust of S. Calif.,* 3 Employee Benefits Cas. (BNA) 1713 (C.D.Cal.1982) (issue whether two sole shareholders were "employers").

### D. *Identifying Arbitral Jurisdiction*

■ Tiger also claims that, because its complaint challenges the applicability of MPPAA's entire administrative scheme to this dispute, it cannot be compelled to arbitrate a question of arbitral jurisdiction. Tiger relies on the Supreme Court's unanimous decision in *AT & T Technologies, Inc. v. Communications Workers of Am.,* 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (*"AT & T Technologies"*). Tiger argues that arbitrators derive their authority from MPPAA; if there is ambiguity concerning the applicability of its arbitration provisions, "it [i]s for the court, not the arbitrator, to decide in the first instance whether the dispute [i]s to be resolved through arbitration." *Id.* at 651, 106 S.Ct. at 1420.

Tiger's argument fails for two reasons. First, we note that *AT & T Technologies* concerned a federal court's duty to interpret the arbitration clause of a collective bargaining agreement, and was not a case of a court addressing the arbitration provisions of a federal statute such as MPPAA.[15] In addition, we note that the

---

**15.** It is not clearly established law that the principle of *AT & T Technologies* "applies whether the duty to arbitrate is based on contract ... or arises by operation of federal law." Brief of Appellants at 24. Indeed, *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), which Tiger represents as a decision concerning the "operation of federal law," Brief of Appellants at 24, is more accurately described as a decision that derives a preference for arbitration from the interaction of a collective bargaining agreement and the federal common law of labor relations. *See* 376 U.S. at 548–51, 84 S.Ct. at 913–15 ("We thus find [the employer]'s obligation to arbitrate this dispute in [its predecessor employer's] contract con-

district court did not compel Tiger to arbitrate a legal question of the arbitrator's jurisdiction. Rather, the district court considered the statutory issue and decided that the dispute here must be arbitrated under MPPAA section 1401. This decision was consistent with *AT & T Technologies,* where the Supreme Court emphasized that, in deciding whether a dispute is subject to arbitration, "a court is not to rule on the potential merits of the underlying claims." 475 U.S. at 649, 106 S.Ct. at 1419. For this reason, Tiger's argument on the merits—that the plans have not demonstrated that Tiger's conduct fails to satisfy the good faith requirement of MPPAA section 1392(c), *see generally Dorn's Transp., Inc. v. Teamsters Pension Trust Fund of Philadelphia & Vicinity,* 787 F.2d 897, 902–03 (3d Cir.1986) ("*Dorn's* "),[16]—has no bearing on our decision that the arbitrator must decide the merits initially.

## IV. EXHAUSTION DOCTRINE

It is a settled principle of law that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–464, 82 L.Ed. 638 (1938). The primary purpose of this exhaustion doctrine is to allow an administrative agency or an arbitrator to perform functions within its special competence: to create a factual record, to apply its expertise, and to correct its own errors so as to eliminate potential controversies that would otherwise end up in federal court.[17] This Court has held that the policies underlying the exhaustion doctrine are generally applicable to the arbitration proceedings established by MPPAA. *Republic Industries,* 693 F.2d at 294–95.

Tiger argues that it should not be required to exhaust any administrative procedures, such as arbitration, that may be prescribed by MPPAA because Tiger falls within recognized exceptions to the doctrine. Initially, we note that "[e]xceptions to [MPPAA's] 'arbitrate first' rule are narrowly cabined," *Grand Union,* 808 F.2d at 68, and "apply only in 'extraordinary circumstances.' " *Republic Industries,* 693 F.2d at 294 (quoting *First Jersey Securities, Inc. v. Bergen,* 605 F.2d 690, 696 (3d Cir.1979)). Nevertheless, there may be such circumstances where the arbitral process would be either inappropriate or futile. We conclude, however, that Tiger's dispute does not fall within one of these narrow exceptions.

### A. *Irreparable Injury*

■ If forcing a plaintiff to follow a designated administrative procedure would cause the plaintiff irreparable harm, then that plaintiff may bypass those procedures

strued in the context of national labor policy."); *cf. AT & T Technologies,* 475 U.S. at 653, 106 S.Ct. at 1421 ("in light of the congressional policy making arbitration the favored method of dispute resolution," a labor contract's standard arbitration clause creates a presumption that disputes should be arbitrated) (Brennan, J., joined by Burger, C.J., and Marshall, J., concurring). Thus, to the extent such precedents bear upon the question before us, we believe they point *toward* arbitration.

**16.** In *Dorn's,* the principal stockholder and chief executive officer of Dorn's Transportation, Inc. ("Dorn's"), sold all of his stock to Oneida Motor Freight, Inc. ("Oneida"). Oneida offered uninterrupted employment to all of Dorn's former employees. Oneida, pursuant to a collective bargaining agreement that mirrored Dorn's, also made uninterrupted pension contributions on behalf of those employees who accepted its job offer. At the time of the stock sale, however, Oneida was "indisputabl[y]" unaware that

Dorn's was trying to avoid MPPAA withdrawal liability. 787 F.2d at 902. Given those "unusual circumstances," *id.* at 898, we determined that section 1392 did not apply to the transaction, concluding that,

> when the seller enters a transaction to escape liability, but the buyer has no intention of taking subsequent actions that will reduce the payments owing to the Plan, it does not appear that a "principal purpose of the transaction" as a whole is to escape liability. [Th]ere, given Oneida's lack of awareness of Dorn's potential liability and Oneida's long period of continued payments, Oneida c[ould ]not be said to have entered the transaction in order to evade liability.

*Id.* at 902.

**17.** See *Republic Industries,* 693 F.2d at 293–98, for a thorough discussion of the policy concerns behind this exhaustion doctrine and its application in the context of MPPAA.

and seek judicial relief directly. *Republic Industries*, 693 F.2d at 293. The district court originally ruled that Tiger had satisfied the irreparable injury exception to the exhaustion doctrine. On reconsideration, however, the district court reversed itself, holding that Tiger would be no more harmed by arbitration than by judicial review. *Flying Tiger Line, Inc. v. Central States* at 15. We will affirm the district court's reconsidered conclusion.

Tiger claims that its precarious financial position will be jeopardized by the plans' assertion of withdrawal liability. Tiger's creditors are presumably aware, however, of these liability assertions by the plans. Any impact on creditors' perceptions of Tiger's fiscal health should therefore not vary with the actor who resolves this dispute. Tiger also argues that, if it is forced to arbitrate its claim, the plans will demand interim payments pursuant to MPPAA section 1401(d). As the district court noted, however, section 1401(d) is not self-enforcing. Even if the plans succeed in winning an arbitrator's judgment, they would still have to obtain a court order to compel payments from Tiger. *See United Retail & Wholesale Employees Teamsters Union Local No. 115 v. Yahn & McDonnell, Inc.,* 787 F.2d 128, 134 (3d Cir.1986), *aff'd per curiam by an equally divided court sub nom. Pension Benefit Guar. Corp. v. Yahn & McDonnell Inc.,* —— U.S. ——, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987). At that point in time, Tiger could present evidence that it faced irreparable injury. Further, the mere possibility of such a court decision concerning interim payments has no independent legal effect on the question whether Tiger's dispute is to be arbitrated; the possibility that a court may in the future deny a fund's request to compel payments, based upon an employer's demonstration of irreparable injury and the court's preliminary review of the merits, does not determine whether the underlying dispute must, by law, be arbitrated.[18]

## B. *Questions of Statutory Interpretation*

The Supreme Court has held that the requirements of the exhaustion doctrine are also not applicable where the question is "solely one of statutory interpretation ... [and t]he resolution of th[e] issue does not require any particular expertise on the part of the [arbitrator]...." *McKart v. United States*, 395 U.S. 185, 197–98, 89 S.Ct. 1657, 1664–65, 23 L.Ed.2d 194 (1969); *accord Dorn's*, 787 F.2d at 903 ("arbitration may be bypassed when the district court faces only questions of statutory interpretation").[19] Under this second exception to exhaustion doctrine, Tiger argues that Count I of its complaint should be decided by a court because it raises questions of statutory interpretation.

The factors that led this Court in *Dorn's* to bypass arbitration are not present in the case at bar. The dispute there focused on whether a withdrawal occurred when a contributing employer and principal stockholder sold all of his stock to a corporation that continued to make contributions to the same multiemployer pension plans pursuant to an identical collective bargaining agreement. 787 F.2d at 901. The *Dorn's* issue arose under MPPAA section 1398, which states that,

[n]otwithstanding any other provision of this part, an employer shall not be con-

---

18. In this regard, we note the following language from a PBGC amicus brief filed in the Fifth Circuit, which the Seventh Circuit has recently quoted with approval: " 'Even when a court denies interim payments based on demonstrated irreparable injury and a preliminary review of the merits, the underlying dispute should still be arbitrated.' " *Robbins v. McNicholas Transp. Co.,* 819 F.2d 682, 686 (7th Cir. 1987) (quoting Brief of Amicus Curiae PBGC, *Central States, Southeast & Southwest Areas Pension Fund v. T.I.M.E.–D.C., Inc.,* 826 F.2d 320 (5th Cir.1987)).

19. In *Dorn's*, however, we emphasized "the unusual circumstances of th[e] case," 787 F.2d at 901, and we noted that MPPAA arbitration "could be bypassed only in rare cases in which it would be of little use." *Id.* at 903. Indeed, when we subsequently denied Dorn's motion for attorney's fees under MPPAA, we reiterated "the extreme narrowness of our holding." *Dorn's Transp., Inc. v. Teamsters Pension Trust Fund of Philadelphia & Vicinity,* 799 F.2d 45, 51 (3d Cir.1986).

sidered to have withdrawn from a plan solely because

> (1) an employer ceases to exist by reason of
>
> (a) a change in corporate structure described in Section 1362(d) of this title....

29 U.S.C. § 1398 (1982). Accordingly, one of the issues decided in *Dorn's* was whether the requirements of MPPAA section 1362(d)[20] had been satisfied. Our analysis of that provision did not, however, contravene the clear mandate of MPPAA section 1401 to arbitrate disputes that arise under sections 1381 through 1399. In addition, while the funds in *Dorn's* alleged that discovery was necessary to prove whether the transaction violated the good faith requirement of § 1392(c), it was undisputed that the stock purchaser was unaware that the seller was attempting to escape withdrawal liability. *See supra* note 16. We concluded that, "[s]ince the ... transaction did not involve the kind of bad faith addressed by § 1392[ (c) ], there was no disputed issue of material fact." *Dorn's,* 787 F.2d at 902.

In reaching the merits of the dispute, we therefore emphasized that it "was a *rare case* in which there was no need for the development of a factual record...." *Id.* at 903 (emphasis added).

Our case differs from *Dorn's* in two significant respects. First, as we have noted throughout this opinion, the statutory interpretation in this case involves only a MPPAA section that Congress explicitly reserved for arbitration. Second, the district court here concluded that "[t]he present factual submissions and allegations before the Court indicate that there is a genuine factual dispute surrounding the [bona fides of the] 1985 transaction."[21] *Flying Tiger Line, Inc. v. Central States,* at 17. By contrast, *Dorn's* —and the other decisions Tiger has cited as supporting its position that the district court, and not an arbitrator, should address this dispute in the first instance—concerned a set of undisputed facts that allowed the court to identify the MPPAA employer therein as a matter of law.[22]

---

**20.** Section 1362(d) specifies that,

> [f]or the purposes of this section[,] the following rules apply in the case of certain corporate reorganizations:
>
> . . . . .
>
> (3) If an employer ceases to exist by reason of a merger, consolidation, or division, the successor corporation or corporations shall be treated as the employer to whom this section applies.

29 U.S.C. § 1362(d) (1982).

**21.** On the record before us, we cannot fault the district court's assessment. The record evidence includes, for instance, an affidavit by Thomas C. Nyhan, one of Central States' attorneys in the Hall's bankruptcy proceeding. Nyhan states that, at a meeting of Hall's creditors on May 14, 1986, Alvin Bodford, the sole shareholder of HAC, "stated that a principal purpose of the transfer of 75% of the common stock of Hall's Motor Transit Co. to Hall's Acquisition Corp. was to evade or avoid withdrawal liability." J.A. at 292. In addition, we take judicial notice of the fact that actors in our free enterprise system are not primarily guided by their eleemosynary impulses; when a large corporation relinquishes for no consideration at all its remaining 25% interest in another corporation, a unique event has occurred. On the whole, it is easy to understand why a detailed factual inquiry is needed to ascertain whether Tiger's "sale" of Hall's to HAC was made to evade or avoid MPPAA withdrawal liability.

**22.** *See American Stevedoring Corp. v. Burlington Indus., Inc.,* No. 85 C 4180, slip op. at —— (N.D. Ill. Dec. 19, 1985) (where first corporation "leased" its employees to second, and second was obligated by contract to reimburse first for pension contributions it made on behalf of employees whom second had leased, court had "no hesitation in holding both ... to be employers for purposes of determining withdrawal liability") [Available on WESTLAW, DCT database] (LEXIS, Genfed library, Dist file); *American Stevedoring Corp. v. Burlington Indus., Inc.,* No. 85 C 4180, slip op. at —— (N.D.Ill. Aug. 8, 1985) ("Deciding whether [two corporations] are employers within the meaning of [ERISA's definition] appears to be a question that can be decided on a paper record....") [Available on WESTLAW, DCT database] (LEXIS, Genfed library, Dist file); *Central Pa. Teamster's Pension Fund v. Service Group, Inc.,* 645 F.Supp. 996, 998 (E.D.Pa.1985) (facts indicated that two corporations divided "many aspects of the employer-employee relationship [that] are usually vested in the employer"; "[b]oth ... had enough control over the [employees] to render the[se corporations MPPAA] employers"); *United Paperworkers Int'l Union, Local No. 35 Pension Plan v. Arlington Sample Book Co.,* 5 Employee Benefits Cas. (BNA) 1948 (E.D.Pa.1984) (undisputed affidavits demonstrated that corporations were not under common control); *Baldwin v. Shopmen's Ironworkers Pension Trust of S.Cal.,* 3 Employee Benefits Cas. (BNA) 1713 (C.D.Cal.1982) (no fac-

This Court has recently reaffirmed that, under MPPAA, "determinations of fact ... are well within the province of an arbitrator." *Warner-Lambert Co., Inc. v. United Retail & Wholesale Employee's Teamster Local No. 115 Pension Plan,* 791 F.2d 283, 288 (3d Cir.1986). In addition, even when a dispute raises a mixed question of law and fact, the Act's statutory framework dictates that arbitration should be the initial forum for dispute resolution. "The fact that the arbitrator will ultimately have to apply the statute to the facts it finds does not render these issues inappropriate for arbitration in the first instance." *Id.* Distinctions between questions of fact and law are, after all, often rather tenuous,[23] and MPPAA's language and purposes convince us that any doubt concerning fact/law differentiation as a means of determining whether arbitration is appropriate should be resolved in favor of arbitration. MPPAA section 1401, for instance, does not differentiate between legal and factual questions; it simply dictates that *"[a]ny dispute* between an employer and the plan sponsor ... shall be resolved through arbitration." 29 U.S.C. § 1401 (1982) (emphasis added). In accordance with such a clear statutory directive, we conclude that "whether an employer's defense is a question of fact, or of law, or a mixed question of fact and law, is often difficult to discern, and should not be left for the employer itself to decide in the first instance." *Chipman Trucking,* 8 Employee Benefits Cas. (BNA) at 1261.

The District of Columbia Circuit recently held that when MPPAA provisions earmarked for arbitration are involved in a dispute, questions of statutory interpretation should not alter the forum for dispute resolution. "From the unambiguous language by which Congress established the primacy of arbitration in withdrawal liability disputes and in light of our decisions interpreting those terms, it should be beyond cavil that the existence of an issue of statutory interpretation, standing alone, does not justify bypassing arbitration." *I.A.M. Nat'l Pension Fund, Plan A, A Benefits v. Clinton Engines Corp.,* 825 F.2d 415, 418 (D.C.Cir.1987) (*"Clinton Engines"*); *accord Republic Indus., Inc. v. Teamsters Joint Council No. 83 of Va. Pension Fund,* 718 F.2d 628, 635 (4th Cir. 1983) (MPPAA requires that "a nice [mixed] question of fact and law" must be decided by an arbitrator), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984); *Chipman Trucking,* 8 Employee Benefits Cas. (BNA) at 1262 ("The purposes of the arbitration requirement are best served by the parties resorting first to arbitration, even where one of the parties believes the issues are limited to statutory interpretation."); *Combs v. Pelbro Fuel, Inc.,* No. 83–1524, mem. op. at 14 (D.D.C. Nov. 15, 1984) (".... Congress has devised an elaborate statutory scheme for resolving disputes that may arise over the determinations and amounts of withdrawal liability. To permit an employer to stylize his [or her] claim into a 'question of law' and thereby bypass this framework would surely frustrate the intent of Congress and should not be sanctioned by the courts.") [Available on WESTLAW, DCT Database].[24]

tual dispute that two sole shareholders controlled corporation).

**23.** *Cf. John Wiley & Sons, Inc.,* 376 U.S. at 556–57, 84 S.Ct. at 917–18 ("We think that labor disputes of the kind involved here cannot be broken down so easily into their 'substantive' and 'procedural' aspects. Questions concerning the procedural prerequisites to arbitration do not arise in a vaccuum; they develop in the context of an actual dispute....").

**24.** *Cf. Shearson/American Express, Inc. v. McMahon,* —— U.S. ——, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987) ("Th[e] duty to enforce arbitration agreements [that is established by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*] is not diminished when a party bound by an agreement raises a claim founded on statutory rights.... '[W]e are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals' should inhibit enforcement of the [Arbitration] Act'....") (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626–27, 105 S.Ct. 3346, 3354–55, 87 L.Ed.2d 444 (1985)); *I.A.M. Nat'l Pension Fund Plan A v. Clinton Engines Corp.,* No. 85–2877, mem. op. at —— (D.D.C. Apr. 28, 1986) (a question that is "purely one of statutory interpretation" is extremely rare in an ERISA case), *aff'd, Clinton Engines,* 825 F.2d 415 (D.C.Cir.1987); *Williamson Shaft Contracting Co., Inc. v. United Mine*

## V. CONCLUSION

For the foregoing reasons, we will affirm the district court's order staying Count I of Tiger's complaint pending MPPAA arbitration.

*Workers of America 1974 Pension Plan,* 585 F.Supp. 633, 634–35 (W.D.Pa.1984) ("It is hard for me to envision what is solely a matter for statutory interpretation without reference to facts. Philosophers may be able to do this, but not this court.").