GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff

v.

MILTON ROY BERRY, LEROY BRYAN, Defendants

Crim. No. 1974-36

District Court of the Virgin Islands

Div. of St. Thomas

November 7, 1974

YOUNG, *District Judge*

### MEMORANDUM OPINION AND ORDER

Defendant Leroy Bryan (herein, "Bryan") moves pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure to suppress for use as evidence two tires mounted with rims which were seized from the trunk of his automo-

bile allegedly in violation of the Fourth Amendment prohibition against unreasonable searches and seizures. He further moves, in accordance with Rule 5(a), to exclude from evidence at trial two incriminating statements made by him at police headquarters on the morning of March 2, 1974.

# I

## BACKGROUND FACTS

At a suppression hearing held on October 25, 1974, Bryan testified that at about 9:30 p.m. on Friday evening, March 1, 1974, he went to a dance at the Mafolie Clubhouse in St. Thomas. There he met co-defendant Michael Berry (herein, "Berry"), and after having several drinks, the two left the clubhouse in Berry's car for "Pier 2", a bar located near the Submarine Base in Charlotte Amalie. Bryan further testified that he and Berry returned to the dance, at which time they were informed that one Joseph Francis had been shot and killed in the parking area near the clubhouse.

Chief Inspector Griffin testified that sometime during the evening, the victim Francis and a friend went outside of the clubhouse to see whether their cars were properly secured, for it had been rumored that some of the cars parked in the area may have been tampered with. While inspecting one of their cars, they heard a noise and saw the shadows of two figures in an area where other cars were parked, approximately 65 feet downhill from where they were standing. Francis looked and possibly moved toward the area of the noise and shadows. At this instant, the companion heard a shot or "explosion" in the vicinity of the noise and shadows and saw Francis fall to the ground, fatally wounded.

An on-the-scene investigation by Chief Inspector Griffin revealed that a Mazda automobile about thirty feet from

the body of the victim had two wheels and tires missing. Behind the Mazda was a car which one of the officers recognized as belonging to Bryan. Shortly thereafter, Bryan arrived at the scene in a Volkswagen owned and driven by Berry. The two were thereupon questioned by Inspector Griffin as to their whereabouts immediately preceding their arrival. They indicated that they left the dance and had gone to "Pier 2" at the Submarine Base for pizzas. A later conversation between Griffin and Bryan (detailed more fully below) culminated in a search of the trunk of Bryan's car where the two tires belonging to the Mazda were found. This is the evidence which Bryan seeks to suppress as being obtained by an allegedly unreasonable and illegal search.

Shortly thereafter, at about 2:00 a.m., Bryan and Berry were taken to Fort Christian where Bryan made two statements to Detective Hodge; one, at 3:20 a.m. wherein he denied knowledge and, participation in the theft of the tires and the killing; the other, at approximately 11:20 a.m. wherein he admitted that he and Berry had stolen the tires. According to the police blotter, the two were formally booked for the murder of Joseph Francis at approximately 6:20 a.m. and then locked up in one of Fort Christian's cells. Bryan was taken from the cell at about 11:00 a.m. for further questioning by Detective Hodge. This portion of the facts will be explained in more detail in Section III below.

## II

### SEARCH OF THE CAR

██ Basic to the disposition of any suppression motion in which the fruits of a warrantless search are sought to be excluded at a later trial is the constitutional maxim that "searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se un-

reasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions". Katz v. United States, 389 U.S. 347, 357 (1967). Equally fundamental has been the recognition by the Supreme Court that a suspect's consent to a search of either his person or property can under proper circumstances take the place of either a search warrant or probable cause. See, e.g., Davis v. United States, 328 U.S. 582, 593–94 (1945).

If a prosecutor's justification of the lawfulness of a search is based solely on the consent of the accused, he has the burden of showing that the consent was, in fact, freely and voluntarily given. Bumpers v. North Carolina, 391 U.S. 543, 548–49 (1967). The issue before me then, is simply whether the Government has met this burden.

■ In Schneckloth v. Bustamonte, 412 U.S. 218 (1973), the Supreme Court has recently noted that the question of whether a consent is voluntary or the product of coercion, either overt or subtle, is a question of fact to be determined from a totality of circumstances. Id. at 227. Factors to be considered by a court in assessing the voluntariness of the consent include the nature of the on-the-scene police questioning, the subjective state of mind of the person who consents, his educational background, and the presence or lack of probable cause to arrest or search the suspect.

■ Applying the facts brought out during the hearing in light of the above factors, I find that the prosecution has met its burden of establishing that Bryan's consent to search the trunk of his car was freely and voluntarily given.

Bryan testified that approximately six to eight policemen were scattered along the road running from the place where his car was parked to the clubhouse where the dance was being held. Chief Inspector Griffin estimated that there were between eight and ten officers on the scene during his

interview with Bryan, but added that only he, one other officer and co-defendant Berry were present in the immediate area of Bryan's car when he requested Bryan to check the trunk.

The testimony of Bryan and that of Inspector Griffin's concerning their conversation leading to the opening of the trunk of Bryan's car differ significantly. Bryan testified that after Griffin asked him if he had the keys to his car, the officer told him to open the trunk. Bryan then complied without objection, after which Griffin said, "We found the tires. We got them.". Inspector Griffin, on the other hand, testified that he *asked* Bryan to check the trunk of his car, and that the latter did so readily and without objection. Griffin testified that upon opening the trunk, Bryan exclaimed, "Oh, my God, what is this?". Simply stated, Bryan's version of the encounter adds up to acquiescence on his part to lawful authority; Inspector Griffin's constitutes a free and voluntary consent by Bryan to the search of the trunk of his car.

During oral argument, defense counsel argued, in support of Bryan's version, that Bryan certainly would not have *freely* consented to a search which would reveal incriminating objects as markedly obtrusive as automobile tires. I disagree with counsel's analysis of the facts. Upon being requested to open the trunk by Inspector Griffin, Bryan's options were either to stand on his rights and refuse permission to search, thereby arousing suspicion, or to freely consent to the search and feign surprise upon discovering the stolen tires. The fact that he chose the latter course of action should in no way vitiate the consensual nature of his acquiescence to the search.

Other than Bryan's testimony, which I do not find credible on this point, there is no evidence of any inherently coercive tactics, either from the context and manner of Inspector Griffin's questioning or from the atmosphere in

45

which the questioning took place. There is no reason for me to assume that a mere request by the officer asking Bryan to open the trunk is presumptively coercive.

Bryan's speech and demeanor during direct and cross-examination betray the image offered by defense counsel of a confused, under-educated and inexperienced youth who would be easily swayed by subtle influences. At the hearing, Bryan exhibited a calm manner and spoke with articulation that indicated to me experience and common intelligence beyond that which his ninth grade education would normally indicate. It is doubtful, then, that his will had been subverted by Inspector Griffin's casual and undemanding interview on March 2, 1974.

It is apparent from the testimony of Inspector Griffin that although the investigation had focused somewhat on Bryan and Berry, probable cause to arrest the two did not exist prior to the search of Bryan's car. Upon the arrival of the police and detectives at the scene of the shooting, they discovered the Mazda with two wheels and tires missing. They immediately commenced their investigation by interviewing the owners of all vehicles in the area surrounding the Mazda. The police located and apparently talked to the owners of all cars parked in the area except Bryan, who was known by one of the police to be the owner of the Volkswagen parked in back of the Mazda. Attention was also drawn to Bryan's car by the fact that it was the only one not securely locked and with the window open. After Bryan and Berry arrived at the clubhouse area in Berry's car, Inspector Griffin questioned Berry regarding the appearance of his trousers indicating that he may have been thrashing through bushes and weeds, but Berry gave no responsive answer. These scant facts fall far short of probable cause to believe that the two had taken part in either the theft of the tires or the shooting.

This lack of probable cause is important only insofar as it tends to explain Inspector Griffin's motive in requesting Bryan to open the trunk of his car. Had the search of the trunk proved fruitless, Inspector Griffin may have been convinced that an arrest of Bryan with its possible stigma was unnecessary and that a more extensive search pursuant to a warrant was not justified. A consent search, then, can be a two-edged sword; not only does a successful consent search yield necessary evidence for the prosecution of crime, but an unsuccessful one may insure that a wholly innocent person is not wrongly charged of a crime.

Particularly applicable to the facts of this case is the Supreme Court's language in Schneckloth v. Bustamonte, supra at 227:

> "In situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence." .

### III

#### BRYAN'S CONFESSION

■ Bryan next contends that his 11:20 a.m. confession to Detective Hodge was both involuntary and a product of "unnecessary delay" in being presented before a magistrate and, hence, should be suppressed.

Bryan and Berry were brought to Fort Christian at approximately 2:00 a.m. After having been warned of his rights and having signed a waiver of his rights under Miranda at 2:15 a.m., Bryan was interrogated by Detectives Hodge and Heath until 3:20 a.m., at which time Bryan signed a statement. Essentially, his statement constituted a denial of involvement in either the theft or the shooting. At daybreak, or at about 6:20 a.m. according to the police blotter, there was a routine processing and "booking", following which, Bryan and Berry were put into one

47

of Fort Christian's cells to rest and sleep, as so requested by Bryan. At this point, the testimony is conflicting. Bryan testified that at 8:30 a.m. Detective Hodge called him back to the interrogation room and questioned him further. Detective Hodge, however, claimed that Bryan remained in his cell undisturbed from approximately 6:20 a.m. to sometime after 11:00 a.m., at which time he signed another waiver form and thereafter made an incriminating statement. In the statement signed at 11:20 a.m., Bryan admitted to the theft of the tires. Sometime after 12:00 noon Bryan was released on bail, never having been brought before a magistrate for arraignment. Bryan urges that the failure of the police to bring him before a magistrate between the time of his arrest at 2:00 on the morning of March 2 and his release on bail shortly after the noon hour of that same day mandates exclusion of his 11:20 statement under both the McNabb-Mallory rules and 18 U.S.C. § 3501.

I find that the delay, whether measured under McNabb-Mallory[1] or Section 3501, was not an unnecessary delay under the facts outlined above. Cases that have applied the McNabb-Mallory rule indicate that the determination as to what constitutes an "unnecessary delay" rests not so much on the actual time that has elapsed between arrest and presentment before a magistrate but on how that time was used. United States v. Johnson, 467 F.2d 630, 636 (2d Cir. 1972); United States v. Marrero, 450 F.2d 373, 376 (2d Cir. 1971), cert. denied, 405 U.S. 933 (1972).

A close analysis of the use of the time between 2:00 a.m. and noon on March 2 clearly establishes that there was no "unnecessary delay". The time between 3:20 a.m. when

---

[1] McNabb v. United States, 318 U.S. 332 (1943), and Mallory v. United States, 354 U.S. 449 (1957), have held that evidence secured in violation of Rule 5(a) of the Federal Rules of Criminal Procedure is inadmissible in a federal criminal proceeding. Rule 5(a) requires that "[a]n officer making arrest under a warrant . . . shall take the arrested person without unnecessary delay before the nearest available commissioner . . .".

48

Bryan made his first statement and 6:20 a.m. when he was put into his cell was spent on routine processing of the defendant following his arrest. This span of time, then, cannot be deemed unnecessary. During the period of time which followed, from daylight to approximately 11:00 a.m. as Detective Hodge recalls it, or an interval of almost five hours, Bryan was given an opportunity to rest and to sleep. That period of time, too, was unquestionably necessary. Having accepted Detective Hodge's account of the span between 6:20 a.m. and 11:00 a.m. as being the more credible, I find that the remaining periods of one and one half hours from the time of Bryan's arrest to the making of his first statement and the brief interval between 11:00 a.m. and the defendant's second statement given at 11:20 a.m. do not constitute an "unnecessary delay" within the meaning of the rule. He was released on bail shortly after the noon hour.

During oral argument, Bryan's counsel made no claim that a judge or magistrate was available in his chambers or court during the time period in question. Bryan was not brought to police headquarters until 2:00 a.m. on *Saturday* morning. Whether, as a matter of public policy, there should be routinely available on a twenty-four hour basis and on weekends a magistrate for presentments of arrested persons is not before me. I can only say that it is not the present practice in the District of the Virgin Islands. In the Virgin Islands, Municipal Court Judges are available on twenty-four hours call basis to set bail or to handle other emergencies, but they are not held out as available at all times to conduct presentments and to advise arrested persons of their rights. I cannot hold that the failure to have a presentment of Bryan before a judge prior to his statement made at 11:20 a.m. following his arrest a few hours before constitutes a NcNabb-Mallory violation. There is ample authority for the proposition that overnight deten-

tion for the purpose of presentment the next morning is permissible. See, e.g., United States v. Grandi, 424 F.2d 399, 402–03 (2d Cir. 1970); United States v. Price 345 F.2d 256, 261 (2d Cir.), cert. denied, 382 U.S. 949 (1965).

A similar conclusion must be reached through the application of the standards set forth in 18 U.S.C. § 3501(c), which prohibits ruling a confession inadmissible solely because of delay in bringing a suspect before a magistrate, if the confession was made within six hours of the arrest. The statute expressly extends the six-hour limit if the additional period is found to be reasonable in light of the means of transportation and the distance to be traveled to the nearest available magistrate.

Since it has been squarely held in a number of recent federal decisions that Section 3501 was not intended to expand the protection of potential criminal defendants beyond the scope established by the McNabb-Mallory cases [see, e.g., United States v. Halbert, 436 F.2d 1226 (9th Cir. 1970); Grooms v. United States, 429 F.2d 839 (8th Cir. 1970)], interpretation of the statute becomes less difficult. For, while Section 3501(c) provides that a confession made within six hours of arrest, absent a showing of involuntariness of the statement, is admissible, the converse that a longer delay ipso facto precludes admissibility has not been found to be intended by the legislature. See United States v. Marrero, 450 F.2d 373, 378 (2d Cir. 1971). Not surprisingly, even though the statute speaks in terms of extending the six hour limit only in cases involving transportation difficulties, overnight detention has been held to be an implied exception to Section 3501. See United States v. Marrero, supra at 378.

■ Bryan's final contention that his 11:00 a.m. waiver of Miranda rights and subsequent statement were involuntary I find to be without merit. This contention is based

50

primarily on the fact that by 11:00 a.m. on March 2, Bryan had been without sleep for approximately twenty-eight hours; and that as a consequence of this lack of sleep, he has no recollection of either signing the waiver or making the incriminating statement. Since I have already accepted as credible Detective Hodge's statement that Bryan was given the opportunity to rest and to sleep for approximately five and one half hours between daylight and late morning on March 2, this contention loses much of its substance. Even if Bryan did not in fact sleep during that period, despite an opportunity to do so, his complete lack of recollection of the circumstances surrounding the second statement is clearly incredible. Again, his demeanor on the stand convinces me that his will could not be so easily overcome. Bryan's testimony that various alleged threats were made by Detective Hodge, that Hodge promised to reduce bail if Bryan cooperated, and that Hodge refused to summon an attorney after Bryan had requested one was fully refuted by Detective Hodge and remains uncorroborated in the record.

### ORDER

Upon the facts as I have found and expressed them in the foregoing Memorandum Opinion and for the reasoning set forth therein, it is hereby ORDERED:

1. Defendant Bryan's motion to suppress the evidence found in the search of Bryan's automobile and to suppress all statements made by Bryan on the morning of March 2, 1974 be and they hereby are DENIED.