852 F.2d 156
 57 USLW 2084, 9 Employee Benefits Ca 2491
 The MASON AND DIXON TANK LINES, INC., Plaintiff and
Counter-Defendant-Appellee, Cross-Appellant,
v.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
et al., Defendants and
Counter-Plaintiffs-Appellants, Cross-Appellees.
 Nos. 86-5221, 86-6249 and 86-6289.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 14, 1987.
Decided July 15, 1988.
 
 Russell N. Luplow (argued), Diana L.S. Peters, Bloomfield Hills, Mich., for defendants and counter-plaintiffs-appellants, cross-appellees.
 Don C. Stansberry, Jr., Huntsville, Tenn., Patrick Moran (argued), Fredric A. Smith, Birmingham, Mich., for plaintiff and counter-defendant-appellee, cross-appellant.
 Before WELLFORD, NELSON and BOGGS, Circuit Judges.
 BOGGS, Circuit Judge.
 
 
 1
 Central States, Southeast and Southwest Areas Pension Fund appeals the district court's decision reducing the amount of withdrawal liability assessed against Mason and Dixon Tank Lines, Inc. under the Employee Retirement Income Security Act of 1974, 29 U.S.C. Secs. 1001-1371, as amended by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. Sec. 1381-1461. Because the issues addressed by the district court should have initially been submitted to arbitration, we reverse.
 
 
 2
 * We begin with a brief overview of the statutory scheme governing employee pension benefits. In 1974, Congress enacted the Employee Retirement Income Security Act of 1974, 29 U.S.C. Secs. 1001-1371 (ERISA), to reassure employees who had been promised a pension benefit upon retirement that they would receive it. Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 213-14, 106 S.Ct. 1018, 1020, 89 L.Ed.2d 166 (1986); Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 375, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980). Unfortunately, ERISA did not completely live up to its drafters' expectations. In particular, the statute did not adequately address the adverse consequences that would occur when an employer withdrew from a multiemployer pension plan. As the Supreme Court explained in Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984):
 
 
 3
 A key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage--or force--further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.
 
 
 4
 Id. at 723 n. 2, 104 S.Ct. at 2714 n. 2 (quoting Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2d Sess. 22 (1978) (statement of Matthew M. Lind, Executive Director of the Pension Benefit Guaranty Corporation)).
 
 
 5
 Indeed, congressional study revealed that "the preexisting pension plan termination program, enacted as title IV of [ERISA], perversely operated to provide employers with an incentive to withdraw from financially weak plans." I.A.M. National Pension Fund v. Clinton Engines Corp., 825 F.2d 415, 416 (D.C.Cir.1987). The threat of significant employer withdrawals also jeopardized the solvency of the Pension Benefit Guaranty Corporation, which was created to provide benefits to plan participants in the unfortunate event that a pension plan was terminated without sufficient assets to cover guaranteed benefits. R.A. Gray, 467 U.S. at 721, 104 S.Ct. at 2713.
 
 
 6
 In response to these problems, Congress amended ERISA by enacting the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. Secs. 1381-1461. The MPPAA requires employers who withdraw, completely or partially, from a multiemployer pension plan to contribute to the plan a proportionate share of the unfunded, vested benefits. R.A. Gray, 467 U.S. at 725, 104 S.Ct. at 2715. See Central States, Southeast and Southwest Areas Pension Fund v. 888 Corp., 813 F.2d 760, 762 n. 2 (6th Cir.1987). An employer completely withdraws from a multiemployer pension plan when it (1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan. 29 U.S.C. Sec. 1383(a). A partial withdrawal occurs if (1) there is a seventy-percent contribution decline for a given plan year, or (2) there is a partial cessation of the employer's contribution obligation. Id. at Sec. 1385(a).[1]
 
 
 7
 There is a partial cessation of the employer's contribution obligation for a plan year if, during such year:
 
 
 8
 (i) the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location.
 
 
 9
 29 U.S.C. Sec. 1385(b)(2)(A)(i).
 
 
 10
 In the MPPAA, Congress has established a statutory scheme that is both "lengthy and complex." Marvin Hayes Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 814 F.2d 297, 299 (6th Cir.1987). For present purposes, we need focus only on several provisions that are pertinent to the issues raised here. One key provision, which the MPPAA retained from ERISA, is the common control (or "controlled group") provision. 29 U.S.C. Sec. 1301(b)(1) reads in part as follows:
 
 
 11
 For purposes of this subchapter, under regulations prescribed by the [Pension Benefit Guaranty Corporation], all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer.
 
 
 12
 As the House and Senate Reports indicate, the primary purpose of the common control provision is to ensure that employers will not circumvent their ERISA and MPPAA obligations by operating through separate entities. See S.Rep. No. 383, 93d Cong., 2d Sess. 43, reprinted in 1974 U.S.Code Cong. & Admin.News 4639, 4890, 4928; H.R.Rep. No. 807, 93d Cong., 2d Sess. 50, reprinted in 1974 U.S.Code Cong. & Admin.News 4670, 4716. Accord, Board of Trustees v. H.F. Johnson, Inc., 830 F.2d 1009, 1013 (9th Cir.1987).[2]
 
 
 13
 The MPPAA also contains detailed dispute resolution provisions, in recognition "that the employer and the Plan may not always be in agreement as to the computation of withdrawal liability." Marvin Hayes, 814 F.2d at 299. Once the plan sponsors determine that an employer has completely or partially withdrawn from a pension plan, they must notify the employer of the amount of the liability, prepare a schedule for liability payments, and demand payment in accordance with the schedule. 29 U.S.C. Secs. 1382, 1399(b)(1). Within 90 days after receiving notice, the employer may ask the plan sponsors to review any specific matter relating to the determination of liability and the schedule of payments, may identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer, and may furnish any additional relevant information to the plan sponsor. Id. at Sec. 1399(b)(2)(A). After reasonable review of any matter raised, the plan sponsors must then notify the employer of its decision, including the reasons for any change in the determination of the employer's liability or schedule of liability. Id. at Sec. 1399(b)(2)(B).
 
 
 14
 If either party disputes the outcome, 29 U.S.C. Sec. 1401(a)(1) comes into play:[3]
 
 
 15
 Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration.[4]
 
 
 16
 When arbitration proceedings are completed in favor of one party, any party thereto may bring an action, no later than 30 days after the issuance of the arbitrator's award, in federal court to "enforce, vacate, or modify the arbitrator's award." Id. at Sec. 1401(b)(2). As we noted in Marvin Hayes, 814 F.2d at 299, interim payments of withdrawal liability normally must be made to the plan during the pendency of any dispute. 29 U.S.C. Sec. 1399(c)(2), 1401(d). Accord, Flying Tiger Line v. Teamsters Pension Trust Fund, 830 F.2d 1241, 1244 (3d Cir.1987).
 
 II
 
 17
 We trace the history of this case is some detail in view of the issues raised on appeal. Central States, Southeast and Southwest Areas Pension Fund (Central States) is a multiemployer pension plan as defined by ERISA and the MPPAA, 29 U.S.C. Secs. 1002(37), 1301(a)(3). Mason and Dixon Tank Lines, Inc. (Tank Lines) is a Tennessee corporation engaged in interstate and intrastate hauling of liquid commodities. At all times relevant to this appeal, Tank Lines was the wholly-owned subsidiary of Mason and Dixon, Inc. (Mason and Dixon), a Tennessee trucking company engaged in interstate transport of freight.
 
 
 18
 Tank Lines has a number of terminals, each covered by a separate collective bargaining agreement with a local union affiliated with the International Brotherhood of Teamsters. These collective bargaining agreements require Tank Lines to contribute to the pension fund of Central States. On November 29, 1983, five employees who comprised a discrete bargaining unit at one of Tank Lines's terminals voted to decertify their union. On December 31, as a result of the decertification election, the collective bargaining agreement covering these five employees expired and Tank Lines's obligation with respect to these employees to contribute to the pension fund ceased.
 
 
 19
 The permanent cessation of Tank Lines's obligation under the collective bargaining agreement to contribute to the pension fund, coupled with the fact that the employer continued to perform work previously covered by the expired bargaining agreement, constituted a "partial withdrawal" under the MPPAA. 29 U.S.C. Sec. 1385(b)(2)(A)(i). Tank Lines thus became liable for a proportionate share of the plan's unfunded vested benefits at the time of the withdrawal.
 
 
 20
 During this same period, the ownership of Mason and Dixon and Tank Lines was changing. On November 29, 1983, Central Transport, Inc. (Transport) and its affiliate, GLS LeasCo., Inc. (LeasCo), executed two stock purchase agreements with shareholders of Mason and Dixon, whereby Transport and LeasCo acquired the exclusive right to purchase all of the outstanding shares of Mason and Dixon stock, as well as that of its wholly-owned subsidiary Tank Lines. The stock purchase was contingent upon the approval of the transaction by the Interstate Commerce Commission (ICC).
 
 
 21
 On January 4, 1984, following Tank Lines's partial withdrawal, Transport received temporary ICC authority to operate Mason and Dixon, subject to further ICC review. Transport assumed control on January 9. Permanent ICC authority to operate Mason and Dixon was granted to Transport on March 7, 1984, together with approval of the stock acquisitions. The stock purchase agreements with Mason and Dixon were ultimately consummated in February 1985.
 
 
 22
 Relying on the common control provision, 29 U.S.C. Sec. 1301(b)(1), Central States asserted withdrawal liability against Transport, Mason and Dixon, Tank Lines and several other companies that were allegedly part of a group of businesses under common control.[5] In calculating withdrawal liability, Central States considered the fund contribution record not only of Tank Lines, the corporation with the triggering event, but of all the alleged members of the controlled group. The entire controlled group was thus deemed to have withdrawn partially from the pension fund, based on Tank Lines's cessation of contributions. As Central States summarizes: "[A]lthough the statutory 'event' of withdrawal was initially triggered by the decertification vote of a five-member bargaining unit at Tank Lines, the 'amount' of the withdrawal liability generated by the triggering 'event' followed from the Fund's nondiscretionary application of precise statutory formulae (29 U.S.C. Secs. 1381, 1386, 1391) that look to the aggregated contributions (i.e., the net of any increases and decreases within the controlled group) of all members of a controlled group." (emphasis in original).
 
 
 23
 Central States's method of calculating withdrawal liability produced a dramatic result. Had Tank Lines's withdrawal liability been calculated on the basis of its own record of contributions to the fund with respect to the five employees who decertified their union, the assessment would have been de minimis. By including all members of the controlled group in the liability calculation, however, Central States increased the assessment to some $26 million.
 
 
 24
 In July 1985, Central States notified the alleged members of the controlled group of the amount of withdrawal liability and demanded payment according to a specific schedule. The companies sought review of the assessment pursuant to 29 U.S.C. Sec. 1399(b)(2)(A). On October 31, 1985, the Transport group and Tank Lines filed separate actions against Central States in district court seeking injunctive relief. Both the Transport group and Tank Lines sought a preliminary injunction prohibiting Central States from collecting interim payments of withdrawal liability, pending resolution on the merits.
 
 
 25
 The Transport group argued that it did not own or control Tank Lines on the date of withdrawal (December 31, 1983) and, therefore, could not be the "employer" for purposes of 29 U.S.C. Sec. 1301(b), the common control provision, of the MPPAA. Tank Lines argued that Central States erroneously calculated withdrawal liability by including the contribution history of the Transport group. Rather, the calculation should be based solely on the contribution history of the five employees who voted to decertify the union and hence caused the partial withdrawal. Consistent with this position, Tank Lines had earlier attempted to "cure" the withdrawal by tendering past due pension fund contributions for the five employees who were no longer covered by the collective bargaining agreement. Central States had declined to accept the tender of approximately $25,000, arguing it would violate the terms of the Trust Agreement governing the pension fund.
 
 
 26
 The district court granted a preliminary injunction, prohibiting Central States from collecting interim payments of withdrawal liability. Central Transport, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 639 F.Supp. 788 (E.D.Tenn.1986). Applying traditional principles governing the issuance of injunctive relief, the court concluded that the plaintiffs demonstrated a substantial likelihood of success on the merits, because it appeared that the Transport group did not acquire any control over Mason and Dixon and Tank Lines prior to January 4, 1984. Id. at 791. The court also found that the likelihood of irreparable harm weighed heavily in favor of plaintiffs, since interim payments would impair the credit of each of the companies, would inhibit their ability to operate, and would be likely to cause their demise. Id. at 791-92. Further, the court found that Central States would not be impaired, and the public would be served, by enjoining enforcement of interim payments of withdrawal liability. Id. at 792.
 
 
 27
 The district court also enjoined Central States from commencing arbitration proceedings pursuant to 29 U.S.C. Sec. 1401(a)(1). Id. at 792-93. The court believed that arbitration was unnecessary because the issue at bar--whether the Transport group was the "employer" for purposes of the common control provision of the MPPAA--involved "the interpretation of a critical statutory provision in regard to certain undisputed facts...." Id. at 792. In addition, the issue presented a threshold question whether the plaintiffs had a statutory duty to arbitrate, which was not a proper subject of arbitration under the MPPAA. Id. at 793.
 
 
 28
 Thereafter, the Transport group moved for summary judgment, renewing its contention that it was not the "employer" for purposes of the common control provision on the date Tank Lines withdrew from the pension fund. The district court granted summary judgment on this basis. Central Transport, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 640 F.Supp. 56 (E.D.Tenn.1986). The court observed that, despite the execution of the stock purchase agreements between Transport, LeasCo, and Mason and Dixon on November 29, 1983, prior to Tank Lines's withdrawal on December 31, 1983, the ICC had not issued to Transport and LeasCo the requisite operational control over Mason and Dixon and Tank Lines until January 4, 1984. Nor had the ICC ultimately approved the stock acquisitions as required by law until March 7, 1984. The district court concluded that, absent actual operational control and actual or constructive ownership of Mason and Dixon's and Tank Line's stock by Transport and LeasCo, Tank Lines was not under common control of the Transport group on the withdrawal date, and the Transport group was therefore not subject to withdrawal liability. Id. at 60.
 
 
 29
 The district court's two decisions were consolidated on appeal, and we affirmed in an unpublished opinion for the reasons stated in the lower court's opinions. Central Transport, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 816 F.2d 678 (6th Cir.) (per curiam), cert. denied, --- U.S. ----, 108 S.Ct. 290, 98 L.Ed.2d 250 (1987).
 
 
 30
 While the appeal was pending, and with the Transport group dismissed from the suit, Central States concentrated on Mason and Dixon and Tank Lines. By deleting the contribution histories of the Transport group, Central States reduced the withdrawal liability assessment against Mason and Dixon and Tank Lines to some $17 million.
 
 
 31
 On April 14, 1986, Central States moved to dissolve the preliminary injunction as to Tank Lines. Central States argued primarily that, since it was undisputed that Tank Lines and Mason and Dixon were businesses under common control within the meaning of section 1301(b)(1) of the MPPAA, the issue of statutory interpretation that had preoccupied the district court earlier was already resolved. Hence, an arbitrator should be given an opportunity to decide the remaining issues, including whether the pension plan could calculate withdrawal liability based on the contribution histories of all businesses under common control. Central States petitioned the district court to dismiss Tank Lines's complaint for failure to exhaust administrative remedies or, alternatively, to retain jurisdiction but to remand Tank Lines's claims to arbitration "for resolution of any remaining factual disputes, most importantly, concerning the calculation and amount of withdrawal liability." In response, Tank Lines moved for summary judgment, challenging Central States's method of calculating withdrawal liability.
 
 
 32
 On October 29, 1986, the district court ruled (in an unpublished opinion) that Central States could calculate withdrawal liability based on the pension contribution histories of all the businesses under common control, rather than on the history of the company that withdrew from the pension fund. The court also concluded that Tank Lines could not benefit from Mason and Dixon's discharge of liability in bankruptcy: "While the MPPAA can treat the two corporate entities as one for the calculation and assessment of liability, they are not a single employer for the purposes of the bankruptcy law and Tank Lines was not a co-debtor with Mason and Dixon in its bankruptcy proceedings."
 
 
 33
 The district court did not believe that Central States violated the MPPAA by refusing to accept Tank Lines's contributions on behalf of the five employees who decertified their union. However, the court indicated that the lawsuit "crie[d] out for an equitable solution." Sidestepping Tank Lines's request to consider the constitutionality of the MPPAA as applied, the court instead indicated that it had the equitable power under 29 U.S.C. Sec. 1451(a)[6] "not to impose withdrawal liability in an arbitrary or capricious fashion or to the extent that it puts Tank Lines' out of business." The court concluded that while the imposition of withdrawal liability under the facts of the case was lawful, equity required that liability be limited to twenty-five percent of Tank Lines's net worth. This liability was to be satisfied, over time, in a way that would not force Tank Lines out of operation. The court reasoned: "To impose further liability would be unfair to the owners of this now solvent company; would put all of its employees out of work; and, in the long run, would even have an adverse impact on Central States by lowering the number of pension fund contributors."[7] Having resolved the issues raised, the court dissolved the preliminary injunction.
 
 
 34
 On appeal, Central States argues that the district court's decision should be vacated and Tank Lines's dispute in its entirety should be submitted to arbitration. However, assuming the court reviews the merits of the district court's decision, Central States seeks affirmance of the issues decided below, excluding the lower court's equitable reduction of the withdrawal liability assessment. In its view, section 1451(a) does not grant equitable jurisdiction for the purpose of reducing a pension fund recovery. Tank Lines has cross-appealed, taking the opposite view on all contentions.
 
 
 35
 We conclude that the issues remaining before the district court must initially be submitted to arbitration under section 1401(a)(1) of the MPPAA. Accordingly, we reverse the district court's decision of October 29, 1986.
 
 III
 
 36
 Under the MPPAA, arbitration is not a jurisdictional prerequisite for district court review. Robbins v. Admiral Merchants Motor Freight, Inc., 846 F.2d 1054, 1056 (7th Cir.1988); Central States Southeast and Southwest Areas Pension Fund v. T.I.M.E.-DC, Inc., 826 F.2d 320, 325-28 (5th Cir.1987); I.A.M. National Pension Fund v. Clinton Engines Corp., 825 F.2d 415, 417 & n. 4 (D.C.Cir.1987). Nevertheless, it is the preferred method of dispute resolution under the MPPAA, and normally the initial step preceding judicial intervention. The language of section 1401(a)(1) makes this clear by stating that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." (emphasis added). Clinton Engines, 825 F.2d at 417.
 
 
 37
 Arbitration serves several important purposes, not the least of which is the promotion of "judicial economy and judicial restraint." Flying Tiger Line v. Teamsters Pension Trust Fund, 830 F.2d 1241, 1248 (3d Cir.1987) (quoting Robbins v. Chipman Trucking, Inc., 693 F.Supp. 628, 635, 8 Employee Benefits Cas. (BNA) 1251, 1258 (N.D.Ill.1986)). The arbitrator's decision may dispose of the dispute, pare down the issues for judicial determination, or simply provide a factual record for effective resolution of the issues. Section 1401(c) establishes a "presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator [are] correct." See Clinton Engines, 825 F.2d at 417. The District of Columbia Circuit has also observed that the MPPAA dispute resolution provisions were designed to "avoid the delay and expense in obtaining payment that pension plan sponsors would suffer were more formal procedures required as a first step in resolving liability disputes." Id. at 426. In reaching this conclusion, the court of appeals relied on legislative history that revealed Congress's dissatisfaction with collection procedures in place before passage of the MPPAA. Id. at 426 n. 20 (relying on Senate Labor Committee, Summary and Analysis of S. 1076 (April 1980), reprinted in BNA Pension Reporter, Supp. No. 310 (Sept. 29, 1980), at 91).
 
 
 38
 We are not alone in concluding that under the MPPAA "arbitration reigns supreme." Clinton Engines, 825 F.2d at 422. See Robbins v. Admiral Merchants Motor Freight, Inc., 846 F.2d 1054 (7th Cir.1988); Teamsters Pension Trust Fund v. Allyn Transportation Co., 832 F.2d 502, 504-05 (9th Cir.1987); Flying Tiger Line v. Teamsters Pension Trust Fund, 830 F.2d 1241, 1248-49 (3d Cir.1987); Clinton Engines, 825 F.2d at 427 (the value of arbitration as "an efficient, expeditious dispute resolution mechanism lies in initial resort to that mechanism.") (emphasis in original). Thus, arbitration is the appropriate forum if there is a dispute concerning whether the employer has completely or partially withdrawn from the pension fund, see, e.g., Allyn Transportation, 832 F.2d at 505-06 (and cases cited therein); Conners v. Brady-Cline Coal Co., 668 F.Supp. 5, 8 (D.D.C.1987), and, if so, the amount of liability. Connors v. BMC Coal Co., 634 F.Supp. 74, 75 (D.D.C.1986). The same is true for the date an employer withdraws from the pension fund. Marvin Hayes, 814 F.2d at 300. The foregoing list is, of course, not exhaustive.
 
 
 39
 We also agree with a growing number of circuits that questions of statutory construction, standing alone, are not exempt from arbitration under the MPPAA. Allyn Transportation, 832 F.2d at 504; Clinton Engines, 825 F.2d at 418. See Flying Tiger Line, 830 F.2d at 1253-55. This conclusion is compelled not only by the statutory mandate that arbitration will govern "any" dispute between the employer and the plan, but also by the important purposes served by arbitration in the MPPAA scheme. See supra at 163-164. There are additional reasons for refusing to recognize an exception for pure statutory questions.
 
 
 40
 [C]arving out such an exception would sap judicial resources by requiring case-by-case determinations of arbitration's utility.... Such an approach, moreover, would yield few countervailing benefits. After all, only in unusual cases are there apt to be no disputed facts. The expenditure of judicial resources necessary to identify this handful of cases would likely outweigh whatever efficiencies might be gained by pretermitting arbitration in these cases.
 
 
 41
 Clinton Engines, 825 F.2d at 422.
 
 IV
 
 42
 In Marvin Hayes v. Central States, Southeast and Southwest Areas Pension Fund, 814 F.2d 297 (6th Cir.1987), we recognized narrow exceptions to the arbitration requirement. After restating the general rule that courts must not entertain the merits of a dispute under the MPPAA prior to arbitration, this court indicated that the rule may not apply if the employer were "mounting a facial constitutional attack or making a verifiable claim of irreparable injury." Id. at 300.
 
 
 43
 We relied on a "verifiable claim of irreparable injury" in our initial decision in these proceedings, when we affirmed the district court's injunction prohibiting Central States from collecting interim payments of withdrawal liability pending resolution of liability on the merits. See Central Transport, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 816 F.2d 678 (6th Cir.) (per curiam), cert. denied, --- U.S. ----, 108 S.Ct. 290, 98 L.Ed.2d 250 (1987). We agreed with the district court that the plaintiffs (the Transport group, Mason and Dixon, and Tank Lines) would be irreparably harmed if an injunction did not issue, because the $26 million withdrawal liability assessment would seriously inhibit the ability of these companies to operate and quite likely might result in their demise. See Central Transport, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 639 F.Supp. 788, 792 (E.D.Tenn.1986).
 
 
 44
 Both the Fifth Circuit and the Seventh Circuit have recognized the availability of injunctive relief in response to a pension fund's request for interim payments of withdrawal liability. Central States Southeast and Southwest Areas Pension Fund v. T.I.M.E.-D.C., Inc., 826 F.2d 320, 330 (5th Cir.1987); Robbins v. McNicholas Transportation Co., 819 F.2d 682, 685 (7th Cir.1987) ("there can be unfairness and injury not likely intended by Congress in compelling interim payments while arbitration of the liability is pending."). We caution, however, that this exception is indeed narrow, and is by no means intended to undermine a congressionally-mandated collection procedure, which has most aptly been described as "pay now, dispute later." McNicholas Transportation, 819 F.2d at 685 (citation omitted). See Marvin Hayes, 814 F.2d at 301 ("the intent of Congress was to secure the funds as soon as possible and iron out the details and disputes later.").[8] Moreover, the possibility that a court might enjoin interim payments based on a verifiable claim of irreparable harm has no "independent legal effect" on whether the underlying dispute must be submitted to arbitration. Flying Tiger Line, 830 F.2d at 1253 & n. 18; T.I.M.E.-DC, 826 F.2d at 330; McNicholas Transportation, 819 F.2d at 686 & n. 4.
 
 V
 
 45
 On the basis of Congress's clear command to resolve MPPAA disputes initially by arbitration, we conclude that the district court erred in failing to stay the dispute between Central States and Tank Lines pending arbitration, since Mason and Dixon was the "employer" for purposes of the common control provision.
 
 
 46
 As noted, the district court granted summary judgment to the Transport group, finding that the Transport group was not the "employer" for purposes of the common control provision on the date of Tank Lines's withdrawal from the pension fund. Once the district court issued its ruling, the Transport group was out of the picture and Central States concentrated on Mason and Dixon and Tank Lines, reducing the withdrawal liability assessment to some $17 million. By this point, the district court no longer needed to consider who the "employer" was under the common control provision, since all parties agreed that Tank Lines was the wholly-owned subsidiary of Mason and Dixon and, therefore, both were under common control.
 
 
 47
 Subsequently, Central States moved to dissolve the preliminary injunction as to Tank Lines. As noted, Central States argued that, since Tank Lines and Mason and Dixon were businesses under common control, the issue of statutory interpretation that preoccupied the district court earlier had already been resolved. Hence, an arbitrator should be given an opportunity to address the remaining issues. We agree with Central States that these remaining issues, which the district court addressed in its October 29, 1986, decision, were subject to arbitration under section 1401(a)(1), even assuming they solely involved questions of statutory interpretation. These issues included whether Tank Lines had a right to "cure" the withdrawal by tendering past due pension fund contributions for the five employees who were no longer covered by the collective bargaining agreement; whether the pension fund's calculation of withdrawal liability could include the contribution histories of all businesses under common control; whether the MPPAA was unconstitutional as applied to Tank Lines;[9] and whether equitable considerations warranted reducing the withdrawal liability assessed.[10]
 
 
 48
 Relying principally on I.A.M. National Pension Fund Benefit Plan C v. Stockton TRI Industries, 727 F.2d 1204 (D.C.Cir.1984), Tank Lines argues that its dispute with Central States merely raised questions of statutory interpretation, which need not be arbitrated. We have already indicated why this conclusion is inconsistent with the MPPAA's clear directive to submit disputes initially to arbitration. We note further that the District of Columbia Circuit rejects the position advocated by Tank Lines, and views Stockton as an "exceptional case," representing a "narrowly cabined" exception to the general rule of "arbitrate first." I.A.M. National Pension Fund v. Clinton Engines Corp., 825 F.2d 415, 417-18 (D.C.Cir.1987); Grand Union Co. v. Food Employers Labor Relations Association, 808 F.2d 66 (D.C.Cir.1987). According to the court of appeals, "initial recourse to arbitration is a statutory directive, one generally to be followed unless neither party timely presses the plea in abatement, and the court finds that deferring a court contest while the parties repair to arbitration 'will neither lead to the application of superior expertise nor promote judicial economy.' " Grand Union, 808 F.2d at 70 (emphasis in original) (quoting Stockton, 727 F.2d at 1210). In the instant case, the exception recognized in Stockton does not apply, inasmuch as Central States pleaded arbitration in a timely fashion. See Allyn Transportation, 832 F.2d at 505.[11]
 
 VI
 
 49
 Tank Lines also argues that this court already resolved the issue of arbitration, by affirming the district court's injunction prohibiting Central States from commencing arbitration pursuant to section 1401(a)(1). Tank Lines asserts that our decision is binding on this appeal under the law of the case doctrine. We disagree.
 
 
 50
 To be sure, we affirmed the district court's issuance of an injunction prohibiting Central States from commencing arbitration pursuant to section 1401(a)(1). But, we viewed the lower court's decision as enjoining arbitration on a singular issue: whether all the plaintiff companies were under common control on the date of Tank Lines's withdrawal from the pension fund and, thus, whether the Transport group was the "employer" for purposes of the common control provision.
 
 
 51
 The rationale that the district court employed for enjoining arbitration makes this clear. See Central Transport, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 639 F.Supp. 788 (E.D.Tenn.1986). In the lower court's view, arbitration was unnecessary and would not promote judicial economy not simply because the issue at bar--whether the Transport group was the "employer" for purposes of the common control provision--raised a pure question of statutory interpretation, but because the issue presented a threshold jurisdictional question whether the plaintiffs had a duty to arbitrate under the MPPAA. As the district court correctly noted,
 
 
 52
 If the plaintiffs are not part of the controlling group or an employer of Tank Lines within the meaning of MPPAA, then obviously there would be no duty to arbitrate.
 
 
 53
 Id. at 793.
 
 
 54
 This was our understanding of the district court's opinion, and provided the basis for affirming the injunction. We did not read the district court's previous decision as having prohibited Central States from arbitrating all issues ever raised in these proceedings. Reviewing the lower court's decision, there is no indication that the court enjoined Central States from arbitrating whether Tank Lines had the right to "cure" the withdrawal by tendering past due pension fund contributions for the five employees who decertified their union; whether the pension fund's calculation of withdrawal liability could include the contribution histories of all businesses under common control; whether the MPPAA was unconstitutional as applied to Tank Lines; and whether equitable considerations warranted reducing the withdrawal liability assessed. Not only is there no mention of these specific issues in the district court's first published opinion, but the parties' briefs to this court in Central States's initial appeal focused solely on the "employer" issue in their discussions of the arbitration requirement.
 
 
 55
 We grant that there may have been some confusion concerning the breadth of the district court's injunction. Despite this, we are confident that our previous opinion did not have the sweeping effect that Tank Lines asserts. We thus reject Tank Lines's contention that all consideration of the arbitration requirement is off-limits in this appeal. Since our affirmance of the district court's injunction merely prohibited Central States from arbitrating the issue of whether the Transport group was the "employer" under the MPPAA, it follows that the question of the arbitrability of the remaining issues is not barred by the law of the case doctrine.
 
 
 56
 Our previous decision in this case reflects a third narrow exception to the arbitration requirement. This exception allows a company to bypass arbitration for the limited purpose of determining whether it is an "employer" within the meaning of section 1401(a)(1). This conclusion follows from the language of that section, which states that arbitration shall govern disputes between an "employer" and the plan sponsor. Since only an "employer" is required to arbitrate, the district court may address this threshold question before arbitration. Flying Tiger Line v. Teamsters Pension Trust Fund, 830 F.2d 1241, 1249-51 (9th Cir.1987); Banner v. Central States, Southeast and Southwest Areas Pension Fund, 657 F.Supp. 875, 881 (N.D.Ill.1987) ("whether one ever became an 'employer' for purposes of ERISA generally and MPPAA in particular" is an issue "for the court since its resolution determines the arbitrator's authority over the dispute."), issue certified for appeal, 663 F.Supp. 1290, subsequent opinion, 663 F.Supp. 1292, 1295. See Tri-States Rubber & Equipment, Inc. v. Central States Southeast and Southwest Areas Pension Fund, 661 F.Supp. 46, 48 (E.D.Mich.1987) ("Whether plaintiffs are 'an employer' subject to the provisions governing withdrawal liability is an issue that does not involve computation or arbitration."); Refined Sugars, Inc. v. Local 807 Labor-Management Pension Fund, 580 F.Supp. 1457, 1461-62 (S.D.N.Y.1984) (Refined Sugars "cannot be compelled to arbitrate its dispute with defendants if it is not subject to the MPPAA. The dispute as to its employer status must be resolved by this court in order to determine whether the MPPAA is applicable to it at all."), subsequent opinion, 632 F.Supp. 630 (S.D.N.Y.1986).
 
 
 57
 In summary, we conclude that the issues addressed by the district court must be submitted initially to arbitration under section 1401(a)(1) of the MPPAA. Accordingly, the district court's decision of October 29, 1986, is REVERSED.[12]
 
 WELLFORD, Circuit Judge, concurring:
 
 58
 I am in agreement with Judge Boggs in all respects except that I am not prepared to say that an employer who makes a constitutional challenge to MPPAA or to its effect in a particular case is required first to submit the constitutional claim to arbitration. We have previously intimated that this type of defense in a controversy arising out of a partial withdrawal assessment by fund trustees may give a federal district court jurisdiction without first submitting the dispute to arbitration:
 
 
 59
 Unless an employer is mounting a facial constitutional attack or making a verifiable claim of irreparable injury, the courts have no jurisdiction to entertain the merits of the dispute prior to arbitration.
 
 
 60
 Marvin Hayes Lines, Inc. v. Central States Southeast and Southwest Areas Pension Fund, 814 F.2d 297, 300 (6th Cir.1987) (emphasis added).
 
 
 61
 Where, as here, the employer is raising a constitutional claim together with other defenses and objections to the proposed assessment and the amount thereof of withdrawal liability, it may be that the arbitrator may be called upon to make a decision about constitutionality of MPPAA subject to later judicial review. The facts of this case present one of the "worst case" scenarios in respect to the often criticized MPPAA enactment. See Central Transport, Inc. v. Central States Etc. Pension Fund, 816 F.2d 678 (6th Cir.) (unpublished), cert. denied, --- U.S. ----, 108 S.Ct. 290, 98 L.Ed.2d 250 (1987), for a review of the Pension Fund's effort to assess some $26 million against an employer because of the voluntary and unsolicited vote of five employees to withdraw from the collective bargaining agreement, and no longer have the union as a bargaining agent.
 
 
 62
 I concur, however, in the decision to reverse and to remand for arbitration under the circumstances of this case.
 
 
 
 [1]
 The MPPAA exempts certain transactions from withdrawal liability. See, e.g., 29 U.S.C. Secs. 1384, 1385(b)(2)(B), 1390, 1398(1), (2). However, any transaction that is designed to "evade or avoid" withdrawal liability must be ignored: "If the principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." Id. at Sec. 1392(c)
 
 
 [2]
 According to Senator Williams, a key MPPAA sponsor:
 Under current law, a group of trades or businesses under common control, whether or not incorporated, is treated as a single employer for purposes of employer liability under Title IV. Thus, if a terminating single employer plan is maintained by one or more members of a controlled group, the entire group is the "employer" and is responsible for any employer liability. The leading case in this area is Pension Benefit Guaranty Corp. v. Ouimet Corp., 470 F.Supp. 945 (D.Mass.1979), in which the court correctly held that all members of a controlled group are jointly and severally liable for employer liability under section 4062 [29 U.S.C. Sec. 1362] of ERISA. The bill does not modify the definition of "employer" in any way, and the Ouimet decision remains good law.
 
 
 [126]
 Cong.Rec. S11672 (August 26, 1980)
 
 
 [3]
 If no arbitration proceeding has been initiated pursuant to section 1401(a)(1), the amounts demanded by the plan sponsor under section 1399(b)(1) "shall be due and owing on the schedule set forth by the plan sponsor." 29 U.S.C. Sec. 1401(b)(1). The plan sponsor may bring an action in state or federal court for collection. Ibid
 
 
 [4]
 Section 1401(a)(1) further provides that "[e]ither party may initiate the arbitration proceeding within a 60-day period after the earlier of --(A) the date of notification to the employer under section 1399(b)(2)(B) of this title, or (B) 120 days after the date of the employer's request under section 1399(b)(2)(A) of this title. The parties may jointly initiate arbitration within the 180-day period after the date of the plan sponsor's demand under section 1399(b)(1) of this title."
 
 
 [5]
 When appropriate, we shall differentiate between Mason and Dixon and Tank Lines, on the one hand, and the remaining companies, on the other. The latter companies will be referred to as the "Transport group."
 
 
 [6]
 Section 1451(a)(1) reads:
 A plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer pension plan, or an employee organization which represents such a plan participant or beneficiary for purposes of collective bargaining, may bring an action for appropriate legal or equitable relief, or both.
 
 
 [7]
 The court invited the parties to reach their own agreement concerning the exact amount of liability and the method of payment, or to use the arbitration provisions available under the MPPAA
 
 
 [8]
 All the traditional principles governing the issuance of injunctive relief must be satisfied. See Marvin Hayes Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 814 F.2d 297 (6th Cir.1987)
 
 
 [9]
 Although the arbitrator may not need to reach the constitutionality of the MPPAA as applied to Tank Lines, we do not see any compelling reason that prevents him from doing so
 
 
 [10]
 Neither exception discussed in Marvin Hayes applies. We also note that Tank Lines does not dispute that the issues raised concern a "determination made under sections 1381 through 1399." 29 U.S.C. Sec. 1401(a)(1)
 
 
 [11]
 The reliance by Tank Lines on Central States, Southeast and Southwest Areas Pension Fund v. 888 Corp., 813 F.2d 760 (6th Cir.1987), is also misplaced. Like Stockton, 888 Corp. is an exceptional case. There, we rejected the pension fund's contention that the employer waived any defenses to the liability assessment by failing to initiate arbitration within sixty days of the assessment's notice. We did so because the employer's defense to withdrawal liability, since it was based on section 558 of the Deficit Reduction Act of 1984, Pub.L. 98-369, 98 Stat. 494, 899, did not exist until one year after the deadline for requesting arbitration had passed and four and one-half months after the pension fund filed its lawsuit to recover the assessment. 888 Corp., 813 F.2d at 764 ("We decline to find that 888 is out of court because it failed to arbitrate a defense that it did not have."). We also noted that the facts surrounding the defense were not in dispute, nor was there a need for agency expertise. Ibid
 Not only are these special circumstances not present in the case at bar, but in 888 Corp. we reaffirmed the general rule that "disputes under the MPPAA are normally to be resolved by the arbitral process." Ibid. (relying on Marvin Hayes Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 814 F.2d 297, 300 (6th Cir.1987)). See also 888 Corp., 813 F.2d at 768 n. 1 (Guy, J., dissenting).
 Although Tank Lines points to language in the original slip opinion in 888 Corp. stating that questions involving statutory interpretation are not within the authority or expertise of arbitrators, that language was removed from the court's opinion before publication in the Federal Reporter. As we make clear in the text, the case law is to the contrary.
 
 
 [12]
 We express no opinion on Tank Lines's obligation to make interim payments of withdrawal liability